Timothy Wilson Spencer

v.

Commonwealth of Virginia

Record No. 890096

Timothy Wilson Spencer

v.

Commonwealth of Virginia

Record No. 890097

September 22, 1989

Present: All the Justices

298

*Jeffrey L. Everhart; David J. Johnson (Tuck and Everhart,* on brief), for appellant. (Record Nos. 890096 and 890097.)

*Donald R. Curry, Senior Assistant Attorney General (Mary Sue Terry, Attorney General; Richard A. Conway, Assistant Attorney General*, on brief), for appellee. (Record Nos. 890096 and 890097.)

Justice Stephenson delivered the opinion of the Court.

In one indictment, Timothy Wilson Spencer was charged with capital murder, *i.e.*, the willful, deliberate, and premeditated killing of Debbie Dudley Davis during the commission of, or subsequent to, rape. Former Code § 18.2-31(e) (1987 Cum. Supp.). In a second indictment, Spencer was charged with the rape of Davis. A third indictment charged Spencer with burglary, *i.e.*, breaking and entering Davis' dwelling house in the nighttime with intent to commit rape. The three indictments were tried together, and a jury found Spencer guilty on each charge. The jury fixed his punishment at life imprisonment for rape and at 20 years' imprisonment for burglary. Following the penalty phase of the capital murder trial, the jury fixed Spencer's punishment at death. After a sentencing hearing, the trial court sentenced Spencer in accordance with each jury verdict.

Spencer's appeal of the capital murder conviction has been consolidated with the automatic review of his death sentence, Code §§ 17-110.1(A) and -110.1(F), and we have given them priority on our docket, Code § 17-110.2. By order entered January 26, 1989, Spencer's appeals of the rape and burglary convictions were certified from the Court of Appeals and consolidated with the capital murder appeal. Code § 17-116.06.

## I

## FACTS

Under settled principles of appellate review, we will recite the evidence and all inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial. On Saturday, September 19, 1987, between 1:00 a.m. and 2:00 a.m., a Southside Richmond resident noticed a strange automobile parked outside his home. When he awoke at 6:30 a.m. Saturday morning, the car was still parked in front of his house, the keys were in the ignition, and the engine was running. The resi-

dent called the Richmond Bureau of Police to report the abandoned automobile.

The police checked Division of Motor Vehicles records, which revealed that the automobile was registered to Debbie Dudley Davis. The address listed for Davis was an apartment four blocks from where the car had been abandoned.

When the police arrived at Davis' apartment at 9:35 a.m., they found Davis' body lying face down on her bed. She was clad only in a pair of shorts. Around her neck was a black sock used as a ligature. The ligature was tied around a section of vacuum cleaner pipe, which had been used as a ratchet-device to tighten the sock around Davis' neck. Tied to the neck ligature were shoestrings that bound the victim's left wrist in front of her and her right wrist behind her.

The medical examiner determined that the cause of death was "[l]igature strangulation" caused by "very extreme pressure." The ligature, tightened down and "twisted two or three times" with the vacuum cleaner pipe, had cut "into the larynx, the voice box, [and] the muscles on the side of the neck." The "intense blood pressure congestion" in the victim's head due to the ligature had caused hemorrhage in one of her eyes. The victim also suffered bruising to her nose and mouth.

Three semen stains were found on the comforter from the victim's bed. The fitted bed sheet contained four semen stains. Two "characteristically negroid" hairs were found when Davis' pubic area was combed. The posterior portion of the victim's vagina was bruised. Microscopic examination of smears made from the rectal and vaginal swabs obtained from Davis' body revealed the presence of spermatozoa.

Entry to Davis' apartment had been gained by raising the screen in a kitchen window located approximately eight feet above the ground. Under the window was a rocking chair that had been stolen from the porch of a nearby residence between Friday afternoon and Saturday morning. Inside the kitchen immediately beneath the window was the kitchen sink and counter top. There was no evidence of disarray in Davis' apartment, except that her eyeglasses and toothbrush were found on the floor of the hallway leading to her bedroom.

At the time of Davis' murder, Spencer was living in a Richmond residence approximately 2.7 miles from Davis' apartment. A walk between Davis' apartment and Spencer's residence takes

about 37 minutes. Spencer had left his residence at 7:30 p.m. on Friday, September 18, and had not returned until 12:30 a.m. on Saturday, September 19. Davis, who had had a telephone conversation with her parents Friday evening, was last known to have been alive between 8:30 p.m. and 9:00 p.m. Friday.

Forensic analysis established that the two Negroid hairs combed from Davis' pubic area "were consistent with" Spencer's underarm hair. Analysis of the semen stains found on Davis' comforter and bed sheet showed that the stains had been deposited by a "secretor," *i.e.*, one whose blood characteristics are expressed in other bodily fluids. Analysis of Spencer's blood and saliva samples established that Spencer, who is a secretor with blood type O, PGM type 1, PGM subtype 1+, and peptidase A type 1, was "included in a group [comprising approximately 13 percent of the population] that could have contributed the seminal fluid" found on the comforter and bed sheet.

Spencer's blood sample and the semen collected from the comforter and from the bed sheet were subjected to a forensic procedure that detects and labels the unique configurations of an individual's deoxyribonucleic acid (DNA) molecules, the substance that carries a person's genetic information.[1] This "DNA print identification" technique established that the DNA molecules extracted from Spencer's blood were identical to the DNA molecules extracted from the semen stains. Spencer is a black male. The statistical likelihood of finding duplication of Spencer's particular DNA pattern in the population of North American blacks is one in 705 million. There are approximately 10 million black males in North America.

## II

## PRETRIAL MATTERS

## A

### *Constitutionality of the Death Penalty*

By a pretrial motion to dismiss, Spencer challenged the constitutionality of the death penalty. The trial court rejected his several contentions, and Spencer assigns error to the rulings.

---

[1] For a concise explanation of the DNA printing procedure, see Part IV, *infra*.

■ Spencer first contends that "[t]he death penalty is, in all circumstances, cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the United States Constitution." He further contends that the "facts and circumstances" in the present case do not justify imposition of the death penalty; thus, he asserts, the death penalty statute is "cruel and unusual punishment" as applied to him. Reaffirming our previous holdings, we reject Spencer's contention that the death penalty constitutes "cruel and unusual punishment." *See, e.g., Spencer v. Commonwealth*, 238 Va. 275, 281, 384 S.E.2d 775, 777-78 (1989) (this day decided) (compiling cases) (*Spencer I*).

We also reaffirm our previous holdings and reject Spencer's claims that a capital sentencing jury is vested with an unconstitutional degree of discretion, *see, e.g., M. Smith v. Commonwealth*, 219 Va. 455, 476, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979), and that Virginia's statutory aggravating factors are unconstitutionally vague, *see, e.g., Hoke v. Commonwealth*, 237 Va. 303, 305, 377 S.E.2d 595, 597, *cert. denied*, 491 U.S. ___, 109 S.Ct. 3201 (1989); *Gray v. Commonwealth*, 233 Va. 313, 320-21, 356 S.E.2d 157, 161, *cert. denied*, 484 U.S. 873 (1987) (compiling cases).[2]

## B

### *Right of Spencer to Act as Co-counsel*

Spencer also filed a pretrial motion requesting that he be permitted "to participate as co-counsel in the presentation of his own defense." He contends that he has the constitutional right to act as co-counsel. We do not agree.

■ Spencer, of course, has a Sixth Amendment right to counsel. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335 (1963). He also has the right to conduct his own defense. *Faretta v. California*, 422 U.S. 806 (1975). *See also Townes v. Commonwealth*, 234 Va. 307, 318, 362 S.E.2d 650, 656 (1987), *cert. denied*, 485 U.S. 971 (1988). Spencer, however, did not assert his right to conduct his own defense. Instead, he asserted a "hybrid" right, *i.e.*, both

---

[2] To the extent that Spencer seeks to raise an "equal protection" claim in this appeal, such claim, not having been raised at trial, is defaulted. Rule 5:25. Also defaulted for the same reason is Spencer's claim on appeal that the death penalty statute is "vague" because it "does not specify which party bears the burden of proof on the question of mitigation, and does not specify the standard of proof for carrying that burden."

the right to the assistance of counsel and the right to serve as co-counsel.

Under *Faretta*, a *pro se* defendant retains actual control over the case he chooses to present. *McKaskle* v. *Wiggins*, 465 U.S. 168, 178 (1984). Indeed, control "is the core of the *Faretta* right." *Id.* Conversely, when a defendant does not assert his *Faretta* right, counsel has control over the presentation of the case. *See Townes*, 234 Va. at 320, 362 S.E.2d at 657.

If a defendant were permitted to act as co-counsel, however, such a "hybrid" representation could promote a conflict over who controls tactical trial decisions, thereby frustrating the orderly conduct of the trial. "*Faretta* does not require a trial judge to permit 'hybrid' representation," *McKaskle*, 465 U.S. at 183, and we hold that no such constitutional right exists.[3]

## C

### Discovery Claims

Spencer filed a pretrial motion seeking, *inter alia*, written scientific reports and the "work notes [or] memoranda" that were the basis of the reports. The trial court granted the motion as to the reports, but ruled that the "work notes are not discoverable." We agree.

■ Spencer's discovery rights are controlled by Rule 3A:11. While that Rule permits a defendant to discover written "scientific reports," by its very terms the Rule "does not authorize the discovery . . . of reports, memoranda or other internal Commonwealth documents made by agents in connection with the investigation or prosecution of the case. . . ." *See Bunch* v. *Commonwealth*, 225 Va. 423, 436, 304 S.E.2d 271, 278, *cert. denied*, 464 U.S. 977 (1983); *Bellfield* v. *Commonwealth*, 215 Va. 303, 306, 208 S.E.2d 771, 774 (1974), *cert. denied*, 420 U.S. 965 (1975).

■ Moreover, contrary to Spencer's assertion that the Due Process Clause mandates discovery of the material, "[t]here is no general constitutional right to discovery in a criminal case." *Lowe* v. *Commonwealth*, 218 Va. 670, 679, 239 S.E.2d 112, 118 (1977) (citing *Weatherford* v. *Bursey*, 429 U.S. 545, 559 (1977)), *cert. denied*, 435 U.S. 930 (1978). Indeed, "the Due Process Clause has little to say regarding the amount of discovery which the par-

---

[3] Because of our holding on this issue, we need not address Spencer's other contentions relating to his alleged right to act as co-counsel.

ties must be afforded." *Wardius* v. *Oregon*, 412 U.S. 470, 474 (1973).

Spencer also argues that the trial court erred in permitting the Commonwealth to introduce updated statistics on the probability of the DNA extracted from the semen stains found at the crime scene matching the DNA extracted from Spencer's blood samples. He admits that, pursuant to the discovery order, he received a copy of the written report concerning DNA print identification testing prior to trial. The report stated that the chance that anyone other than Spencer produced the semen stains was one in 135 million.

Dr. Kevin C. McElfresh, an expert in molecular and population genetics and the manager and supervisor of the forensic and paternity laboratories at Lifecodes Corporation in New York, testified on behalf of the Commonwealth at a pretrial hearing concerning the admissibility of the DNA printing evidence. Spencer admits that Dr. McElfresh testified that the probability figure contained in the written report had been calculated in March 1988 and that an August 30, 1988 update of the data base had increased the probability of a random match to one in 705 million.[4] Nonetheless, Spencer contends that the Commonwealth violated its continuing duty under the discovery order by failing to provide him a written report of the updated statistics and that the trial court therefore erred in permitting Dr. McElfresh to testify at trial about the new probability figure.

Significantly, Spencer does not allege, and, indeed, we cannot discern from the record, any element of prejudice or surprise resulting from the timing of the disclosure of the new statistics. As previously noted, Spencer was made cognizant of the updated probability figure before trial. Prior to his cross-examination of Dr. McElfresh at trial, Spencer requested and was granted an overnight recess to consult with a scientist about the new figure.

■ Following the overnight recess, Spencer did not request a continuance nor did he indicate that he was unprepared to cross-examine Dr. McElfresh. Indeed, Spencer's cross-examination of Dr. McElfresh was skilled and thorough. We hold, therefore, that

---

[4] For an explanation of how a larger data base increases the statistical likelihood of finding matching DNA patterns in a given population, see *Spencer I*, 238 Va. at 288 n.8, 384 S.E.2d at 782 n.8.

Spencer's claim concerning the admission into evidence of the updated statistics is without merit.[5]

## D

### *Pretrial Testimony of Dr. Richard J. Roberts*

In a pretrial hearing on the admissibility of the DNA print test evidence, Dr. Richard J. Roberts, Assistant Director of the Cold Spring Harbor Laboratory in New York, testified as an expert for the Commonwealth. While qualifying Dr. Roberts as an expert, the Commonwealth, over Spencer's objection, was permitted to show that the director of the laboratory had won the Nobel Prize. On appeal, Spencer contends that the trial court "violated [his] rights to due process, equal protection and a fair trial as guaranteed by the 5th, 6th and 14th Amendments to the United States Constitution." The contention is meritless.

■ Assuming, without deciding, that the testimony was inadmissible, a trial court, as opposed to a jury, is presumed to separate "the admissible from the inadmissible," and to have considered only competent evidence. *Richard Eckhart* v. *Commonwealth*, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981). Moreover, Dr. Roberts' qualifications were substantial and unchallenged by Spencer. Indeed, whether Dr. Roberts qualified as an expert was a matter within the trial court's sound discretion, *Lane* v. *Commonwealth*, 223 Va. 713, 718, 292 S.E.2d 358, 361 (1982), and we find no abuse of that discretion.

■ During the same pretrial hearing, Dr. Roberts testified unequivocally that there was no disagreement in the scientific community about the reliability of DNA print testing. Spencer contends that the trial court limited his cross-examination of Dr. Roberts on this point. Because Spencer failed to proffer the questions he wanted to ask Dr. Roberts and the answers Dr. Roberts would have made, we are unable to review Spencer's claim. *See*

---

[5] Alleging a third violation of the discovery order, Spencer has assigned error to the trial court's permitting Dr. McElfresh to testify about the written protocol that delineates the specific procedures followed by Lifecodes laboratory personnel in the conduct of a DNA print test. During the pretrial hearing, Dr. McElfresh stated that he would "[g]ladly" give Spencer a copy of the protocol if he wanted it. Spencer did not indicate that he found this remedy unsatisfactory, and he never again brought the matter to the trial court's attention. He, therefore, has waived this claim for purposes of appeal. Rule 5:25.

*Mackall* v. *Commonwealth*, 236 Va. 240, 256-57, 372 S.E.2d 759, 769 (1988), *cert. denied*, 492 U.S. ____, 109 S.Ct. 3261 (1989).[6]

## III

## JURY MATTERS

### A

### *Voir Dire*

During the voir dire of prospective juror Patricia Jackson, Spencer's counsel asked Jackson the following question in an attempt to show bias: "If an individual who is a scientist, an expert gets on the stand and tells you a fact, would you accept that as fact simply because he is a scientist?" The trial court ruled the question improper on the ground that Spencer was "asking the juror to pass on testimony before the whole evidence is there." Spencer assigns error to the court's ruling.

Spencer further contends that the trial court erred by asking Jackson during voir dire if she "would impose the death penalty." Spencer asserts that, under *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968) and *Wainwright* v. *Witt*, 469 U.S. 412 (1985), the appropriate question "is whether or not one can *consider* imposition of the death penalty, not whether or not one would actually vote for it." (Emphasis in original.)

Under Rule 5:25, certain principles govern our review of assignments of error concerning the voir dire of prospective jurors. If a party objects to rulings made during the voir dire of a prospective juror, but subsequently fails to object to the seating of that juror, the party has waived the voir dire objections. Grounds of objections to the seating of a juror that are not stated with sufficient specificity at the time of the trial court's ruling will not be considered on appeal.

Although Spencer objected to the court's rulings during voir dire, he voiced no objection when the court seated Jackson on the

---

[6] Prior to trial, the court, over Spencer's objection, permitted the Commonwealth to obtain "hair, blood and saliva samples" from Spencer. The ground for Spencer's objection was that the Commonwealth had failed to establish "probable cause." When the evidence was introduced at trial, however, Spencer voiced no objection to its admissibility. Because Spencer did not object at trial to the admissibility of this evidence, we will not consider the issue on appeal. Rule 5:25.

jury panel. We hold, therefore, that Spencer waived the objections he made during the voir dire of Jackson. Rule 5:25.[7]

## B

### *Exclusions*

■ The trial court excluded for cause two prospective jurors, Mary Greene and Alma Wright, on the ground that they were unwilling to consider imposing the death penalty. Spencer acknowledges that a trial court in a capital case properly may exclude a juror whose views concerning imposition of a death sentence " 'would prevent or substantially impair the performance of his duties . . . in accordance with his instructions and his oath.' " *O'Dell* v. *Commonwealth*, 234 Va. 672, 695, 364 S.E.2d 491, 504 (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 (1980)), *cert. denied*, 488 U.S. ___, 109 S.Ct. 186 (1988). Spencer asserts, however, that Greene does not fall into this category.[8] Although Greene initially stated she did not believe in the death penalty, Spencer contends that he successfully rehabilitated her.

Because a trial judge "sees and hears the juror," *Wainwright*, 469 U.S. at 426, an appellate court must accord the trial judge deference in applying the *Adams-O'Dell* standard, *LeVasseur* v. *Commonwealth*, 225 Va. 564, 584-85, 304 S.E.2d 644, 654-55 (1983), *cert. denied*, 464 U.S. 1063 (1984). Absent a showing of "manifest error," we will not disturb the trial judge's decision on appeal. *Bennett* v. *Commonwealth*, 236 Va. 448, 469, 374 S.E.2d 303, 316 (1988), *cert. denied*, 490 U.S. ___, 109 S.Ct. 1765 (1989).

Prior to Spencer's attempt to rehabilitate Greene, she stated unequivocally on seven separate occasions that, if given a choice between voting for life imprisonment and voting for the death penalty, she would vote for life imprisonment. In addition, she responded to a question from the trial judge by indicating that she would not, under any circumstances, vote for the death penalty.

---

[7] We likewise reject Spencer's claim of error concerning the voir dire of prospective juror Steven Sinnenberg. Spencer made no objection to Sinnenberg's being seated on the jury panel and, therefore, waived any objection he made to the trial court's voir dire ruling. Rule 5:25.

[8] The exclusion claim concerning Wright that Spencer raises on appeal is not the same claim he raised when the trial court excluded Wright. Therefore, we will not consider his claim on appeal. Rule 5:25.

During Spencer's rehabilitation attempt, Greene unequivocally stated on four different occasions that she "would vote for life." Nonetheless, Spencer says the following exchange successfully rehabilitated Greene:

> MRS. GREENE: I would have some . . . recommendations for them to contain this individual [in prison].
>
> [DEFENSE COUNSEL]: As a juror, you can't make those recommendations. The question is, could you consider both options [if an imprisoned individual is still a future danger]?
>
> MRS. GREENE: Okay. He or she runs the risk of killing the prison personnel?
>
> [DEFENSE COUNSEL]: Let's assume that. You are convinced of that beyond a reasonable doubt.
>
> MRS. GREENE: Well, I guess I could consider it.

█ We do not agree that Greene's equivocal response to Spencer's strained hypothetical successfully rehabilitated Greene. We must consider Greene's response in light of the entire voir dire examination, *see Wise* v. *Commonwealth*, 230 Va. 322, 325-26, 337 S.E.2d 715, 717-18 (1985), *cert. denied*, 475 U.S. 1112 (1986), during which she unequivocally stated 12 different times that she would vote only for life imprisonment. We conclude that the record clearly supports the trial court's finding that Greene's views about the death penalty would have substantially impaired the performance of her duties as a juror.

## C

### Retention

Spencer contends that the trial court should have excluded for cause venireman Ann Kent because she had been exposed to pretrial publicity about another murder allegedly committed by Spencer in the City of Richmond. The trial judge, who saw and heard the examination of Kent, ruled that she could be fair and impartial. That finding is entitled to great weight and will not be reversed absent a showing of abuse of discretion or manifest error. *Mackall*, 236 Va. at 252, 372 S.E.2d at 767.

 "[I]t is not necessary that prospective jurors be entirely ignorant of the facts and issues in the case." *Pope* v. *Commonwealth*, 234 Va. 114, 124, 360 S.E.2d 352, 358 (1987), *cert. denied*, 485 U.S. 1015 (1988). All that is required is that the venireman "can lay aside [his] impressions or opinions and render a verdict based on the evidence presented in court." *Washington* v. *Commonwealth*, 228 Va. 535, 544, 323 S.E.2d 577, 584 (1984), *cert. denied*, 471 U.S. 1111 (1985). *See also Irvin* v. *Dowd*, 366 U.S. 717, 723 (1961).

In this case, venireman Kent specifically stated that, based on what she had read, heard, or seen, she had neither expressed nor formed any opinion as to Spencer's guilt or innocence. She further stated that she could "be impartial in terms of reviewing any evidence in court." Thus, we conclude that the court did not abuse its discretion in retaining Kent as a juror. Clearly, the record supports the trial court's ruling.

## D

### Batson Issue

Relying upon *Batson* v. *Kentucky*, 476 U.S. 79 (1986), Spencer contends that the Commonwealth "systematically exclud[ed] Blacks from the jury panel through the use of [its] peremptory strikes." The final jury panel consisted of 20 individuals, 13 of whom were black and 7 of whom were white. The Commonwealth peremptorily struck four blacks. Spencer used two of his peremptory strikes to remove black individuals. The final 12-person jury consisted of seven blacks and five whites.

 The Supreme Court held in *Batson* that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89. To establish a prima facie case of purposeful discrimination in the selection of the jury based on the prosecutor's use of peremptory challenges, the defendant

> first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defen-

dant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at 96 (citations omitted).

 In the present case, the Commonwealth's Attorney explained his reasons for each of the four peremptory strikes. The trial judge expressly ruled that he was "convinced, beyond a doubt, [the reasons were] not racial." The court noted that, as a general matter, juries drawn from the Richmond jurisdiction are predominantly black. The court further noted, and defense counsel agreed, that the Commonwealth's Attorney had never exhibited a pattern of racially discriminatory jury strikes in the cases he tried. Because the trial court's findings largely "turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n.21.

 Assuming, without deciding, that Spencer established a prima facie case of purposeful discrimination under the *Batson* criteria, we conclude that the record clearly establishes that the Commonwealth's Attorney had racially-neutral reasons for striking each of the four veniremen. The Commonwealth's Attorney observed that one venireman had a record of criminal activity dating to 1938. The Commonwealth's Attorney also opined that another venireman was lacking in knowledge of matters that would make her a competent juror. The prosecutor struck two other veniremen because he felt they gave internally inconsistent responses during voir dire about their respective abilities to consider imposing the death penalty.

We conclude, therefore, that the record supports the trial court's findings that the Commonwealth's Attorney articulated reasonable, nonracial bases for each of the strikes.

## IV

## GUILT PHASE

### A

### *Opening Statement*

Spencer contends that the trial court erred in limiting the scope of his opening statement. Spencer's counsel began his opening statement by telling the jury of the seriousness of the case, of Spencer's presumption of innocence, and of the Commonwealth's burden of proving Spencer guilty by evidence beyond a reasonable doubt. Spencer's counsel conceded that Davis had been the victim of a violent crime, but told the jury that Spencer "did not commit that crime."

Spencer's counsel then proceeded to tell the jury what he expected the Commonwealth's evidence would show. At that point, the Commonwealth's Attorney objected on the ground that Spencer's opening statement should be limited to what Spencer's evidence would show. The trial court sustained the objection because Spencer's counsel had been "arguing" his case. The court stated:

> The purpose of the opening statement is to tell the jury where your evidence anticipates going. That allows you to show what your evidence might be. *Your case might be based on weaknesses that you will point out of the Commonwealth's case. But this is not the time for argument.*

(Emphasis added.)

Although Spencer contends that his counsel "was entitled to discuss the anticipated evidence," it is clear from the trial court's ruling that his counsel was not in fact precluded from doing so. Indeed, the court told defense counsel that Spencer's case might be based on weaknesses in the Commonwealth's evidence that counsel "will point out." Moreover, the record discloses that when defense counsel resumed his opening statement, he repeatedly told the jury what he anticipated the Commonwealth's evidence would show. He also stated that the defense would endeavor to discredit the Commonwealth's expert testimony.

██ While Spencer had a statutory right to an opening statement, Code § 19.2-265, the trial court may exercise "broad discretion in the supervision of opening statements," *O'Dell*, 234 Va.

at 703, 364 S.E.2d at 509. Clearly, the trial court did not abuse its discretion in ruling that Spencer's counsel could not use the opening statement "for argument."

B

*Admission into Evidence of Photographs and Videotape*

■ Spencer contends the trial court erred in admitting into evidence three still photographs and a videotape of the crime scene. The admission of photographs into evidence rests within the sound discretion of the trial court. *Bennett*, 236 Va. at 471, 374 S.E.2d at 317-18; *Gray*, 233 Va. at 342, 356 S.E.2d at 173 (compiling cases). Likewise, the admission into evidence of a crime-scene videotape is discretionary with the trial court. *Stamper* v. *Commonwealth*, 220 Va. 260, 270-71, 257 S.E.2d 808, 816 (1979), *cert. denied*, 445 U.S. 972 (1980).

Spencer does not claim that the photographs are inaccurate. He merely asserts that "the horrific nature of the photos, coupled with their redundancy when combined with the videotape, render the photos prejudicial to the extent that any probative value is clearly outweighed." Nor does Spencer claim that the videotape is inaccurate. He argues, however, that "the introduction of the graphic videotape, coupled with the still photographs, was inflammatory to the point of tending to induce a guilty verdict regardless of any other evidence."

The photographic evidence in the present case, as in *Stamper*, "portrayed a scene of otherwise indescribable violence." 220 Va. at 271, 257 S.E.2d at 816. The evidence was relevant because it tended to show motive, intent, method, malice, premeditation and the atrociousness of the crimes. *Gray*, 233 Va. at 342-43, 356 S.E.2d at 173. Where as here, photographic evidence accurately portrays the crime scene created by an accused, the evidence is not rendered inadmissible simply because it is gruesome or shocking. *Id.* at 343, 356 S.E.2d at 173. We conclude, therefore, that the trial court did not abuse its discretion in admitting this photographic evidence.

## C

### *Qualifying an Expert Witness*

Spencer contends that the trial court erred in qualifying Dr. McElfresh as an expert in the fields of molecular and population genetics. In doing so, Spencer asserts, the trial court "violated [his constitutional] rights to due process, equal protection and a fair trial."

Whether a witness may qualify as an expert is a matter that rests largely in a trial court's discretion. The trial court's decision will not be disturbed on appeal unless it clearly appears that the witness was not qualified. *Freeman* v. *Commonwealth*, 223 Va. 301, 315, 288 S.E.2d 461, 469 (1982).

As previously stated, Dr. McElfresh is the manager and supervisor of the forensic and paternity testing laboratories at Lifecodes Corporation. In addition to his supervisory duties at the laboratory, Dr. McElfresh has personally used the DNA printing technique "over a hundred times" at Lifecodes' laboratory and approximately "[a] thousand" times at other locations. He previously had qualified as an expert witness in the fields of molecular genetics and population genetics on eight occasions. Both counsel and the court examined Dr. McElfresh about his professional qualifications and his expertise in the DNA printing technique.

From the examination, the court found that Dr. McElfresh was "eminently qualified" to render an opinion in the fields of molecular and population genetics. Clearly, in making this finding, the trial court did not abuse its discretion.[9]

## D

### *DNA Printing*

Spencer assigns error to the trial court's admitting into evidence the results of the DNA print identification test. We briefly summarize the test as described by the expert witnesses.[10]

The DNA molecule is described as a double-helical strand and physically resembles a twisted ladder. The molecule is contained

---

[9] Spencer raises two other contentions respecting Dr. McElfresh's testimony that are frivolous and without merit.

[10] For a detailed explanation of the DNA print identification technique, see *Spencer I*, 238 Va. at 286-89, 384 S.E.2d at 781-82.

in every cell that has a nucleus, which includes nearly all the cells of the human body. The configuration of the DNA molecule differs in every individual with the exception of identical twins. The DNA molecule's configuration is the same in every nucleated cell of a particular person, and its characteristics do not change during the life of that individual.

The DNA molecule is very complicated, and certain chemical procedures must be performed to "read" the genetic information contained in the molecule. Once the DNA is chemically extracted from the biological specimen, enzymes called "restriction endonucleases" are applied to the molecule. These enzymes recognize particular sequences of genetic information coded by certain chemicals. At the precise point of recognition, the enzymes cut the DNA strand into fragments. Next, a procedure called "electrophoresis" is used to separate the different lengths of the DNA fragments. The DNA fragments are then transferred to a piece of nylon membrane. Next, radioactive probes are added, which identify and bind to particular fragments that the probes are designed to recognize. The resulting accumulation of radioactivity exposes X-ray film that is placed next to the nylon membrane. Developing the X-ray film reveals bands of DNA. The pattern of the bands is then compared to the pattern of DNA bands obtained from testing other specimens.

A sample of Spencer's blood and the semen stains discovered at the crime scene were forwarded to Lifecodes Corporation for DNA print identification testing. The tests established that the DNA extracted from the semen stains matched the DNA extracted from Spencer's blood sample. The statistical likelihood that anyone other than Spencer produced the semen stains is one in 705 million.

Spencer argues that the DNA tests results were inadmissible because the Commonwealth failed to establish the test's reliability as required by *O'Dell*, 234 Va. 672, 364 S.E.2d 491. We do not agree.

The record is replete with uncontradicted expert testimony that no "dissent whatsoever [exists] in the scientific community" concerning the reliability of the DNA printing technique. Unrebutted expert testimony further established that the testing procedure performed in this case was conducted in a reliable manner. Indeed, defense counsel admitted to the trial judge that he had no

evidence to contradict the testimony of the Commonwealth's experts.

Because the undisputed evidence supports the trial court's conclusion that DNA testing is a reliable scientific technique and that the tests performed here were properly conducted, we hold that the trial court did not err in admitting into evidence the results of the DNA testing.[11]

## E

### *Jury Instruction "A"*

Spencer contends the trial court erred in refusing Jury Instruction "A," which states that "[a] reasonable doubt is a doubt based on your sound judgment after a full and impartial consideration of all the evidence in the case." Because the precise language is contained in the third paragraph of granted Instruction 1, Spencer's contention is without merit.[12] *See, e.g., Mackall*, 236 Va. at 254, 372 S.E.2d at 768; *Tuggle* v. *Commonwealth*, 228 Va. 493, 508, 323 S.E.2d 539, 548 (1984), *vacated and remanded on other grounds*, 471 U.S. 1096 (1985), *aff'd on remand*, 230 Va. 99, 334 S.E.2d 838 (1985), *cert. denied*, 478 U.S. 1010 (1986); *Stockton* v. *Commonwealth*, 227 Va. 124, 145, 314 S.E.2d 371, 384, *cert. denied*, 469 U.S. 873 (1984).

## F

### *Sufficiency of the Evidence*

Spencer contends that the evidence is insufficient as a matter of law to support the jury's finding that a rape and capital murder occurred. More specifically, he asserts that there is insufficient evidence that his penis penetrated the victim's vagina. We do not agree.

When the victim was discovered, she was nude except for a pair of shorts. She had been bound, beaten, and strangled to death. The posterior of her vagina was bruised. Sperm were found

---

[11] Spencer further contends that the Commonwealth failed to establish that DNA print identification testing also is generally accepted in the scientific community as required by *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923). In *O'Dell*, we rejected adoption of the so-called "*Frye* test," 234 Va. at 695-96, 364 S.E.2d at 504. Even if *Frye* were the test in the Commonwealth, however, the DNA print technique would satisfy the requirements of *Frye*.

[12] We express no opinion, however, with respect to the correctness of this language.

in her vagina and in her rectum. Viewing this evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commonwealth, we hold that the evidence clearly supports the jury's finding of penetration. *See, e.g., Spencer I*, 238 Va. at 284, 384 S.E.2d at 779-80; *Tuggle*, 228 Va. at 509-12, 323 S.E.2d at 549-50.[13]

## V

## PENALTY PHASE

## A

### *Facts*

Spencer had been released from prison to a "half-way" house in Richmond on September 4, 1987, just two weeks before he raped and murdered Davis. Forensic evidence presented during the penalty phase established that Spencer also raped and murdered another Richmond woman in October 1987, and raped and murdered a woman in Arlington in late November 1987. Each of these victims had been strangled to death by strikingly similar methods.

Spencer has been convicted of six prior burglaries, three as an adult and three as a juvenile. His past criminal record also disclosed that Spencer has been convicted of three counts of trespassing.

Spencer presented six witnesses who gave testimony in mitigation. According to these witnesses, Spencer had been a shy, quiet, nonviolent person. He was a "loner." None of these witnesses could believe that he committed the crimes against Davis.

---

[13] Spencer also contends that the evidence is insufficient to support the burglary conviction because the element of "unauthorized entry" was not sufficiently established. This contention was not advanced at trial, and, therefore, we will not consider it on appeal. Rule 5:25.

Nor will we consider Spencer's claim that the trial court erred in refusing to permit Detective Williams to state whether in his opinion "anyone could have climbed in [the victim's kitchen] window and left it in the shape that that's in now." Because the record contains no proffer of what Williams' answer would have been, the issue has not been properly preserved. *See, e.g., Mackall*, 236 Va. at 256-57, 372 S.E.2d at 769; *O'Dell*, 234 Va. at 697-98, 364 S.E.2d at 505-06.

## B

### *Unadjudicated Crimes*

Spencer contends that the trial court erred in admitting evidence concerning the rape-murder of the other Richmond woman and the rape-murder of the woman in Arlington. He asserts that only evidence of adjudicated criminal conduct is admissible. We do not agree.

In the penalty phase of a capital murder case, a jury shall consider "evidence of the prior history of the defendant" in determining whether he "would constitute a continuing serious threat to society." Code § 19.2-264.4(C). We have construed this provision to permit the admission into evidence of unadjudicated misconduct. *See, e.g., O'Dell*, 234 Va. at 700, 364 S.E.2d at 507; *Pruett* v. *Commonwealth*, 232 Va. 266, 285, 351 S.E.2d 1, 12 (1986), *cert. denied*, 482 U.S. 931 (1987); *Watkins* v. *Commonwealth*, 229 Va. 469, 488, 331 S.E.2d 422, 436 (1985), *cert. denied*, 475 U.S. 1099 (1986). Spencer acknowledges these prior holdings, but claims that unadjudicated conduct is admissible only when the evidence consists of "extrajudicial statements" by the defendant. We rejected a similar claim in *Pruett*.

There, the defendant contended that evidence of unadjudicated crimes "should have [been] limited . . . to his videotaped confession." 232 Va. at 283, 351 S.E.2d at 11. Rejecting this contention, we said that "the trial court was [not] bound to limit the evidence of prior unadjudicated conduct to what was revealed by the videotape," *id.* at 284, 351 S.E.2d at 12, and concluded that "evidence of prior criminal acts of violence, whether adjudicated or not, is relevant to a determination of future dangerousness," *id.* at 285, 351 S.E.2d at 12. For the same reason, we conclude that the trial court here did not err in admitting evidence of the Richmond and Arlington rape-murders.

## C

### *Jury Instruction "B"*

Spencer contends that the trial court erred in refusing Instruction "B," which reads as follows:

In order to return a sentence of death, it is absolutely necessary that all twelve jurors agree on the sentence. If any

juror does not believe beyond a reasonable doubt after consideration of all the evidence and the instructions given that a sentence of death is appropriate or if the jury is unable to reach a unanimous decision of a sentence of death, then the Court will impose a sentence of life imprisonment.

In *Justus v. Commonwealth*, 220 Va. 971, 979, 266 S.E.2d 87, 92 (1980), *cert. denied*, 455 U.S. 983 (1982), we said:

The court properly refused an instruction . . . which would have told the jury that if it could not reach agreement as to the appropriate punishment, the court would dismiss [the jury] and impose a life sentence. While this was a correct statement of law it concerned a procedural matter and was not one which should have been the subject of an instruction. It would have been an open invitation for the jury to avoid its responsibility and to disagree.

*See also Pruett*, 232 Va. at 279 n.6, 351 S.E.2d at 9 n.6. We therefore reject this contention.

## VI

### SENTENCE REVIEW

Spencer does not claim that the death sentence was imposed arbitrarily. Nonetheless, Code § 17-110.1 requires us to review the death sentence on the record to determine "[w]hether the sentence . . . was imposed under the influence of passion, prejudice or any other arbitrary factor."

We find nothing in the record to suggest that the sentence is the product of any arbitrary factor. To the contrary, after considering all aggravating and mitigating factors, we conclude that the evidence supports the jury's findings that (1) based on Spencer's prior history and the circumstances surrounding the commission of the offense, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, and (2) Spencer's conduct in committing the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, and aggravated battery to the victim. Code § 19.2-264.4(C).

Code § 17-110.1 also requires us to determine "[w]hether the sentence of death is excessive or disproportionate to the pen-

alty imposed in similar cases, considering both the crime and the defendant." Accordingly, we have accumulated the records of all capital murder cases reviewed by this Court, and having considered those records, we hold that Spencer's death sentence was not excessive or disproportionate to sentences generally imposed by other sentencing bodies in Virginia for comparable or similar crimes. *See, e.g., Hoke,* 237 Va. 303, 377 S.E.2d 595 (capital murder in the commission of robbery, abduction, and rape, both future dangerousness and vileness found); *Stout v. Commonwealth,* 237 Va. 126, 376 S.E.2d 288, *cert. denied,* 492 U.S. _____, 109 S.Ct. 3263 (1989) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Gray,* 233 Va. 313, 356 S.E.2d 157 (capital murder in the commission of robbery, both future dangerousness and vileness found); *Pruett,* 232 Va. 266, 351 S.E.2d 1 (capital murder in the commission of rape and robbery, both future dangerousness and vileness found); *Edmonds v. Commonwealth,* 229 Va. 303, 329 S.E.2d 807, *cert. denied,* 474 U.S. 975 (1985) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Watkins,* 229 Va. 469, 331 S.E.2d 422 (capital murder in the commission of robbery, both future dangerousness and vileness found); *Clozza v. Commonwealth,* 228 Va. 124, 321 S.E.2d 273 (1984), *cert. denied,* 469 U.S. 1230 (1985) (capital murder in the commission of rape, both future dangerousness and vileness found); *Coleman v. Commonwealth,* 226 Va. 31, 307 S.E.2d 864 (1983), *cert. denied,* 465 U.S. 1109 (1984) (capital murder in the commission of rape, both future dangerousness and vileness found); *Quintana v. Commonwealth,* 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied,* 460 U.S. 1029 (1983) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Clanton v. Commonwealth,* 223 Va. 41, 286 S.E.2d 172 (1982) (capital murder in the commission of robbery, both future dangerousness and vileness found); *James Dyral Briley v. Commonwealth,* 221 Va. 563, 273 S.E.2d 57 (1980) (capital murder in the commission of rape and robbery, both future dangerousness and vileness found); *Linwood Earl Briley v. Commonwealth,* 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied,* 451 U.S. 1031 (1981) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Mason v. Commonwealth,* 219 Va. 1091, 254 S.E.2d 116, *cert. denied,* 444 U.S. 919 (1979) (capital murder in the commission of rape, both future dangerousness and vileness found); *M.*

*Smith*, 219 Va. 455, 248 S.E.2d 135 (capital murder in the commission of rape, both future dangerousness and vileness found).

## VII

## CONCLUSION

We have considered all 44 of Spencer's assignments of error. We also have reviewed the death sentence mandated by Code § 17-110.1. We find no error in the trial court's judgments, and therefore, we will affirm them.

Record No. 890096—*Affirmed.*
Record No. 890097—*Affirmed.*