COURT OF APPEALS OF VIRGINIA


Present: Judges Annunziata, Bumgardner and Frank
Argued at Chesapeake, Virginia


RUBEN E. MARTINEZ

OPINION BY
v.          Record No. 0051-03-1                    JUDGE ROBERT P. FRANK
                                                    DECEMBER 23, 2003
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Louis R. Lerner, Judge

Charles E. Haden for appellant.

Michael T. Judge, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


Ruben E. Martinez (appellant) was convicted in a jury trial of first-degree murder, in

violation of Code § 18.2-32, aggravated malicious wounding, in violation of Code § 18.2-51.2,

and two counts of use of a firearm in the commission of a felony, in violation of Code

§ 18.2-53.1. On appeal, he contends the trial court erred (1) in denying his motion to suppress

statements given to police, based on a violation of the Vienna Convention of Consular Relations;

(2) in rejecting his Batson challenge to the Commonwealth's peremptory strike of the only

African-American male on the jury panel; (3) in failing to reduce the murder charge to voluntary

manslaughter; (4) in failing to reduce the aggravated malicious wounding charge to "simple"

maiming; and (5) in denying his motion for a mistrial based on the Commonwealth's failure to

timely disclose its intent to impeach the testimony of appellant's witness. For the reasons stated,

we affirm the convictions.

## BACKGROUND

During a crack cocaine party at the home of Vickie McGillis and David Lee Perry, appellant gave Perry a rock of crack cocaine to sell for him. Appellant told Perry to give him the proceeds of the sale by noon the following day. Perry apparently agreed to this arrangement.

The next morning, at McGillis's home, appellant asked her if she and Gretchen Norris would buy a $20 rock of crack cocaine for him. Norris and McGillis left the house and picked up Vincent Edward Johnson while they were trying to find a drug dealer. Johnson eventually found someone from whom to buy drugs, and the three returned to McGillis's residence with the cocaine.

Appellant and Perry, among others, were at the residence. McGillis gave appellant the rock of crack cocaine she had purchased. Appellant expressed his dissatisfaction with the size of the rock and demanded that McGillis refund his money. At first, McGillis told appellant that she could not return the money, but then said she would pay appellant twenty dollars for the rock. Appellant told McGillis that he wanted the money by noon. He then turned to Perry and informed him that he also wanted the ten dollars Perry owed him by noon. Appellant indicated that, if either one of them did not pay him, he was "going to come in here and take --" Perry interrupted appellant and said that he was "not going to disrespect [his] home and come in and take anything." As Perry finished this statement, appellant "reached in the back of his britches and pulled out a gun and shot [Perry] in the head."

Norris testified, "they didn't argue." While appellant was loud, Perry "just sat on the couch and had his hands on his knees." Prior to the shooting, appellant stood five to six feet from Perry. Once he pulled the gun, he leaned forward. At that point, the gun was three to four feet from Perry.

McGillis testified she went to the restroom after appellant set the deadline for re-payment of his money. While in the bathroom, she heard "arguing going on." She then heard "a loud pop" and "feet running." Once it "got real quiet," she opened the door and saw appellant standing in front of Perry. Perry's head was slumped over. McGillis said, "Oh, my God, what happened?" Appellant, who was standing there, did not respond. McGillis then felt the gun on her upper left arm. She pleaded, "Don't shoot me . . . ." Appellant then shot her.

After appellant shot Perry, Norris testified she left the house and went to her car. As she attempted to unlock her car door, she saw appellant leaving the residence. Norris then heard McGillis say, "Oh, my God, you shot him." Appellant re-entered the house, saying, "I'll shoot them up." Norris then heard several more gunshots. As she began to back her car out of the driveway, appellant left the house again and entered Norris's car with a gun in his hand.[1] Appellant asked Norris to drive him to a bank. Norris drove to the corner of the street and then told appellant she could not drive, suggesting he take the car. Appellant then got out of the car and ran.

Johnson testified that, after he assisted Norton and McGillis purchase the crack cocaine, they had returned to McGillis's residence. Johnson testified that, after appellant said the rock was too small, appellant and Perry were "having words back and forth." "They wasn't [sic] yelling, but it wasn't a quiet talk either." Suddenly, Johnson noticed appellant "went in his back pocket and pulled out a gun." He then heard a gunshot. Johnson saw smoke come from the gun and saw Perry slumped over on the couch. Johnson then ran out of the house. He heard a second shot as he was fleeing down an alley.

---

[1] A neighbor testified he saw appellant exit the house with a gun in his hand and get into the car with Norris.

McGillis was taken to the hospital and underwent surgery for the wounds she sustained. Two years after the surgery, she still had not regained the full use of her left arm.[2] Specifically, because she had not regained full, normal use of her left thumb and left index finger, she was unable to hold anything with "a real good grip." Three of her fingers did not "bend down all the way." Due to this continuing condition, she had difficulty picking up money, buttoning clothes, and doing "anything tedious." While McGillis noted she had made some improvement, she characterized her loss of use of her left hand as "significant."

Around July 11, 2001, appellant was apprehended in Cape May, New Jersey. Detective Thurman Clark of the Hampton Police Department interviewed appellant in Cape May. Clark was told appellant might feign an inability to speak English. The detective read appellant his Miranda v. Arizona, 384 U.S. 436 (1966), rights and confronted appellant about a feigned language barrier. Detective Clark told appellant that he believed appellant "could understand and speak English very well." Clark and appellant then communicated in English and "had no problems communicating whatsoever."

In response to Clark's questions, appellant acknowledged he knew Perry was killed, that Perry owed him "about a thousand dollars," and that he was present when Perry was killed. He denied shooting Perry. He then invoked his right to counsel, and the interview ceased.

During the course of selecting the jury panel, the Commonwealth exercised a peremptory strike of Leslie Bailey, the sole African-American male on the panel. Appellant challenged the strike. In response, the Commonwealth explained:

> While recognizing the fact that [Bailey's] civil rights have been
> restored, . . . he has a prior record of serious felonies, for which he
> was convicted, serious, violent felonies. It causes some concern to
> the Commonwealth about maybe some attitudes that he may have

---

[2] Years earlier, McGillis's right arm had been injured in an automobile accident, resulting in some disability of that hand.

> towards the Commonwealth or towards law enforcement, and
> based upon those reasons, the Commonwealth elected to strike
> him.

Appellant did not argue that this explanation was pretextual. The trial court denied appellant's

Batson v. Kentucky, 476 U.S. 79 (1986), motion, finding "it's a race neutral strike."

## ANALYSIS

### I. VIENNA CONVENTION OF CONSULAR RELATIONS

Appellant contends the trial court erred in denying his motion to suppress his statement to

the police. He argues the police were obligated to advise him of certain rights under the Vienna

Convention on Consular Relations because he is a foreign national. Since he was not advised of

those rights, appellant reasons his statement should have been suppressed.

Article 36 of the Vienna Convention on Consular Relations, 21 U.S.T.S. 77, provides in

subsection (1)(b):

> competent authorities . . . shall, without delay, inform the consular
> post of the sending State, if . . . a national of that State is arrested
> or committed to prison or to custody pending trial or is detained in
> any other manner. Any communication addressed to the consular
> post by the person arrested, in prison, custody or detention shall
> also be forwarded by the said authorities without delay. The said
> authorities shall inform the person concerned without delay of his
> rights under this sub-paragraph . . . .

See also Bell v. Commonwealth, 264 Va. 172, 187, 563 S.E.2d 695, 706 (2002), cert. denied,

537 U.S. 1123 (2003). This provision of the Vienna Convention only applies to nationals when

they are in a foreign country. Id.

The record here does not establish that appellant is a foreign national in the United States

and, thereby, entitled to any application of the Vienna Convention. Apparently, the trial court

held a separate hearing on the motion to suppress appellant's statement. On appeal, the

transcript of that hearing was not timely filed, in violation of Rule 5A:8. By a previous order of

this Court, appellant was allowed to proceed with the appeal, but admonished to "make no

reference to any issue which relies on the transcript of the April 17, 2002 hearing." Martinez v. Commonwealth, Rec. No. 0051-03-1 (May 7, 2003). No evidence in the remaining record establishes appellant's nationality.

Appellant has failed to provide an adequate record to consider his argument on appeal. "If an insufficient record is furnished, the judgment appealed from will be affirmed." White v. Morano, 249 Va. 27, 30, 452 S.E.2d 856, 858 (1995). As appellant provides us no basis in the record upon which to consider his allegation of error, we find no error in the trial court's denial of his motion to suppress.

Additionally, appellant's argument would not prevail if the record had established that appellant is a foreign national. Appellant presumes, if the police do not comply with the provisions of Article 36 or inform him of its provisions, then the exclusionary rule would prohibit use of his statement at trial. This premise is incorrect.

In several cases, the Supreme Court has held that Article 36 does not create an individual right to exclusion of a statement, based on failure to comply with its provisions. In Bell, the Supreme Court explained:

> [E]ven if Article 36 creates legally enforceable individual rights, it does not provide -- explicitly or otherwise -- that a violation of those rights should be remedied by suppression of evidence. See United States v. Li, 206 F.3d 56, 61 (1st Cir.) (*en banc*), cert. denied, 531 U.S. 956 (2000); United States v. Chaparro-Alcantara, 37 F. Supp. 2d 1122, 1125-26 (C.D. Ill. 1999), aff'd, 226 F.3d 616 (7th Cir.), cert. denied, 531 U.S. 1026 (2000). Such a remedy is generally not available when a fundamental right is not implicated. Id. The language of Article 36 does not create a fundamental right comparable to the privilege against self-incrimination. Id. Thus, Bell's claim that the alleged violation of his rights under Article 36 should be remedied by suppressing his statement to the police finds no support in the provisions of the Vienna Convention.

264 Va. at 189, 563 S.E.2d at 707.  See also Shackleford v. Commonwealth, 262 Va. 196, 207,

547 S.E.2d 899, 905-06 (2001); Kasi v. Commonwealth, 256 Va. 407, 419, 508 S.E.2d 57, 64

(1998).

While appellant concedes these cases "would appear to be controlling," he contends they

"were wrongly decided."  Whether he is correct or not, we are bound by the decisions of the

Supreme Court.  See Roane v. Roane, 12 Va. App. 989, 993, 407 S.E.2d 698, 700 (1991) ("[W]e

are bound by decisions of the Supreme Court of Virginia and are without authority to overrule

[them].").  We cannot and do not ignore the clear precedent established by these cases.

Appellant had no right to have his statement excluded based on the provisions of Article 36.

We conclude the trial court did not err in denying appellant's motion to suppress his

statement.

## II.  BATSON CHALLENGE

Appellant maintains the trial court erred in allowing the Commonwealth to strike the sole

African-American male from the venire panel.

> The United States Supreme Court has outlined the procedure for
> determining whether a prosecutor exercised a peremptory strike to
> remove a prospective juror solely on account of the juror's race.  A
> defendant must first establish a *prima facie* showing that the
> peremptory strike was made on the basis of race.  Powers v. Ohio,
> 499 U.S. 400, 409 (1991).  At that point, the burden shifts to the
> prosecution to produce explanations for striking the juror which
> are race-neutral.  Batson, 476 U.S. at 96-97.  Even if race-neutral,
> the reasons may be challenged by the defendant as pretextual.
> United States v. Joe, 928 F.2d 99, 103 (4th Cir. 1991).  Finally, the
> trial court must decide whether the defendant has carried his
> burden of proving purposeful discrimination by the prosecutor in
> selecting the jury panel.  Batson, 476 U.S. at 98.  On appeal, the
> trial court's findings will be reversed only if they are clearly
> erroneous.  Hernandez v. New York, 500 U.S. 352, [368-69]
> (1991); Wright v. Commonwealth, 245 Va. 177, 186, 427 S.E.2d
> 379, 386 (1993).

Buck v. Commonwealth, 247 Va. 449, 450-51, 443 S.E.2d 414, 415 (1994).

We assume, without deciding, that appellant made a *prima facie* showing of discrimination. The prosecutor then explained he struck the juror because he had "serious violent felonies" convictions. While the juror's civil rights had been restored, the Commonwealth was concerned about his attitude toward the Commonwealth and law enforcement. Appellant did not assert that the Commonwealth's reasons were pretextual. The trial court found the reasons were race neutral. This ruling was not erroneous. See Spencer v. Commonwealth, 238 Va. 295, 310, 384 S.E.2d 785, 795 (1989) (noting that a venireman's criminal record can provide a race-neutral basis for peremptory strike).

On appeal, appellant contends that, "[a]lthough the record does not disclose whether there were whites on the jury with criminal records," the Commonwealth's stated reason for the strike was pretextual. However, appellant did not argue to the trial court that the Commonwealth's reason was pretextual. Therefore, Rule 5A:18 bars our review of this argument. See Buck, 247 Va. at 452-53, 443 S.E.2d at 416 (discussing Rule 5:25, the Supreme Court's version of Rule 5A:18).

### III. EVIDENCE OF PREMEDITATION

Appellant maintains the trial court erred in not reducing the murder charge to voluntary manslaughter because the Commonwealth failed to prove premeditation or malice aforethought. Specifically, he claims he was provoked into sudden rage by being "short-changed" on a drug purchase and that the victim's attitude further provoked him. We find the trial court did not err.

First, appellant did not preserve his argument regarding the element of malice. See Rule 5A:18. In his motion to strike at the close of the Commonwealth's evidence, he argued the indictment was defective because it did not contain the word, "malice." Appellant then presented his evidence. At the conclusion of all the evidence, he renewed the "same motions" he made at the end of the Commonwealth's case. At no time did he argue the evidence was

insufficient to prove malice.  As the trial court was not given the opportunity to consider this issue at trial, we will not consider the issue on appeal.  See Campbell v. Commonwealth, 12 Va. App. 476, 481, 405 S.E.2d 1, 3 (1991) (*en banc*).

When an appellant argues the evidence was insufficient to prove the crime of which he was convicted, we review the trial record in the light most favorable to the Commonwealth. Snow v. Commonwealth, 33 Va. App. 766, 774, 537 S.E.2d 6, 10 (2000).

Appellant did preserve his argument regarding premeditation when he argued the charge should be reduced to second-degree murder.  Appellant now argues that he shot Perry without premeditation.  He contends he shot while in a sudden rage, brought on by "being short-changed on a cocaine purchase," in combination with "Perry essentially 'diss[ing]'" him.  We find the evidence was sufficient for the jury to find appellant shot the victim with premeditation.

Premeditation is a factual question, reserved for determination by the fact finder:

> The question whether a defendant is guilty of a premeditated killing of the victim is usually a jury question.  The intention to kill need not exist for any specified length of time prior to the actual killing; the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill.

Weeks v. Commonwealth, 248 Va. 460, 477, 450 S.E.2d 379, 390 (1994).  The Supreme Court explained premeditation in Smith v. Commonwealth:

> What is in issue is the sufficiency of the evidence to show premeditation.  To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder. The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time.  As we said in Pannill v. Commonwealth, 185 Va. 244, 255, 38 S.E.2d 457, 463 (1946), quoting from McDaniel v. Commonwealth, 77 Va. 281, 284 (1883), "it is necessary that the killing should have been done on purpose and not by accident or without design. . . ." The exact state of the defendant's mind at the time of killing is the crucial factor in determining intent.  "It is the will and purpose to kill, not necessarily the interval of time, which determine the grade

of the offense." Akers v. Commonwealth, 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975).

220 Va. 696, 700-01, 261 S.E.2d 550, 553 (1980). See Remington v. Commonwealth, 262 Va. 333, 352-53, 551 S.E.2d 620, 632 (2001), cert. denied, 535 U.S. 1062 (2002). When the sufficiency of the evidence to prove premeditation is challenged on appeal, "it is our duty to look to that evidence which tends to support the verdict and to permit the verdict to stand unless plainly wrong." Snyder v. Commonwealth, 202 Va. 1009, 1016, 121 S.E.2d 452, 457 (1961). See also Norman v. Commonwealth, 2 Va. App. 518, 520, 346 S.E.2d 44, 45 (1986) (noting that the appellate courts will examine the evidence in the light most favorable to the Commonwealth).

The evidence here supports the jury's finding of premeditation. Appellant was engaged in a minor argument with Perry prior to the shooting. Perry was sitting on the couch, presenting no threat. Appellant deliberately reached into the back of his waistband, pulled out a loaded gun, aimed it at Perry's head, leaned over, and shot him at a very short distance. This evidence is sufficient to find premeditation. See Schmitt v. Commonwealth, 262 Va. 127, 143, 547 S.E.2d 186, 197-98 (2001), cert. denied, 534 U.S. 1094 (2002) (finding the evidence sufficient to prove premeditation where the accused entered the bank with a concealed, loaded gun, approached the victim, and then shot him from close range); Bailey v. Commonwealth, 259 Va. 723, 749, 529 S.E.2d 570, 585, cert. denied, 531 U.S. 995 (2000) (finding sufficient evidence of premeditation where the accused walked into a bedroom and shot the victim "twice in the head at close range"); Joseph v. Commonwealth, 249 Va. 78, 87, 452 S.E.2d 862, 868 (1995) ("In our opinion, Joseph's decision to shoot Anderson because he 'laughed' at him, coupled with his extra effort to lean over the counter and shoot Anderson in the back, provide ample evidence of premeditation."). From appellant's purposeful reaching for the gun, his aiming the gun at Perry, and his shooting of Perry in the head, the jury could conclude appellant planned to kill Perry and then executed his plan. We affirm the conviction.

## IV.  PERMANENT DISABILITY

Appellant next contends the trial court erred in not reducing the aggravated malicious wounding under Code § 18.2-51.2 to "simple" malicious wounding under Code § 18.2-51.  He claims the evidence was insufficient to prove McGillis's injuries were severe, causing her "to suffer permanent and significant physical impairment," a required element of the crime of aggravated malicious wounding.[3]  Code § 18.2-51.2.  He further argues no expert testimony "describe[d] the nature of McGillis'[s] wounds, the prognosis for recovery or whether the injuries were permanent and significant."[4]

Our decision in Newton v. Commonwealth, 21 Va. App. 86, 462 S.E.2d 117 (1995), is instructive.  Newton cut the victim with a razor "on the cheek, under his eye, on the wrist, on the ear and several times on the back."  Id. at 88, 462 S.E.2d at 118.  At trial, after the victim had displayed the scars, the trial court noted that the scar on the right side of the victim's face was "obvious and visible."  Id. at 89, 462 S.E.2d at 118.  No expert testimony was presented to explain the long-term implications of the injuries.  Newton argued that the scars did not constitute "permanent and significant physical impairment."  We rejected Newton's argument, adopting the definition of "physical impairment" found in Title 51.5 of the Code: "any physical condition, anatomic loss, or cosmetic disfigurement which is caused by bodily injury, birth defect, or illness."  Id. at 90, 462 S.E.2d at 119.  We held, "[t]he trial court reasonably could

---

[3] Code § 18.2-51.2 says, in part:

> A.  If any person maliciously shoots, stabs, cuts or wounds any other person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill, he shall be guilty of a Class 2 felony if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment.

[4] Appellant did not argue the testimony of an expert *is required* under the statute to prove permanency of the injury.  This issue is defaulted, therefore, under Rule 5A:18.  Scott v. Commonwealth, 31 Va. App. 461, 464-65, 524 S.E.2d 162, 163-64 (2000).

have found from the number of wounds, the need for stitches for some of them, and the resulting scars, still visible after five months, that Bryant's injuries constituted 'permanent and significant physical impairment.'" Id.

Here, appellant shot McGillis in her left shoulder. The bullet entered her shoulder, exited, and re-entered her body. She had two entrance wounds and one exit wound because of the path of the bullet. The bullet lodged next to her spine and had to be removed during surgery. At trial, McGillis showed her scars to the jury, and the jury observed photographs of her wounds prior to surgery. McGillis testified that, two years after the shooting, she still had not regained full use of her left arm and hand. She said she did not have a "real good grip" because her index finger and thumb "don't work right." While she had seen some improvement since the surgery, McGillis characterized her impairment as a significant loss. She explained that she could not pick up money or change and could not button her clothes. She added that she could not do "anything tedious" with her hand.

Considering McGillis's testimony and the physical evidence, the jury could reasonably conclude that McGillis had a permanent and significant physical impairment as a result of the shooting. Accordingly, the trial court did not err in refusing to reduce the charge.

## V. MISTRIAL

Lastly, appellant contends the trial court erred in denying his motion for a mistrial. Appellant claims the Commonwealth deprived him of a fair trial by waiting until the last minute to disclose to him that it intended to impeach the testimony of appellant's investigator. We find appellant's argument without merit.

Prior to the presentation of appellant's case, the prosecutor advised appellant's counsel that, based on prior actions of appellant's investigator, the Commonwealth planned to challenge

the investigator's credibility if he testified. Appellant argued his case would be prejudiced if he could not present the investigator's testimony to impeach the prosecution's witness. The trial court denied the motion for a mistrial.

On appeal, appellant asserts the prosecutor had a duty to timely disclose his intention to impeach appellant's witness. He contends, "evidence challenging the investigator's credibility operated as a surprise . . . and had the effect of depriving him of a fair trial." Without citing any authority, he claims this "trial by ambush . . . effectively deprived [him] of due process."[5] In effect, appellant argues he has a right to discovery of evidence that the Commonwealth intends to use to impeach his witnesses.

We start with the well established premise that there is no general constitutional right to discovery in criminal cases. Weatherford v. Bursey, 429 U.S. 545, 559-60 (1977) (explaining the Constitution does not include a general right to discovery in criminal cases); Spencer, 238 Va. at 303-04, 384 S.E.2d at 791 (noting due process does not include a general right to discovery); Lowe v. Commonwealth, 218 Va. 670, 679, 239 S.E.2d 112, 118 (1977) ("There is no general constitutional right to discovery in a criminal case."). However, a defendant is entitled to exculpatory evidence in the possession of the prosecution.

> The Due Process Clause of the United States Constitution also provides that failure to disclose exculpatory evidence may require reversal where the evidence is material to either guilt or punishment. Lowe v. Commonwealth, 218 Va. 670, 679, 239 S.E.2d 112, 118 (1977), cert. denied, 435 U.S. 930 (1978).
>
> \*   \*   \*   \*   \*   \*   \*
>
> Evidence is exculpatory if it is favorable to the accused and "'material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a

---

[5] Appellant does not argue the Commonwealth violated Rule 3A:11 (discovery in criminal cases) or Code § 19.2-265.4 (failure to provide discovery in criminal cases).

probability sufficient to undermine confidence in the outcome [of the trial].'" Taitano v. Commonwealth, 4 Va. App. 342, 349, 358 S.E.2d 590, 593-94 (1987) (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963); United States v. Bagley, 473 U.S. 667, 682 (1985)) (other citations omitted).

Knight v. Commonwealth, 18 Va. App. 207, 212, 443 S.E.2d 165, 168 (1994). Under Brady, 373 U.S. at 87, exculpatory evidence includes evidence that impeaches the credibility of a prosecution witness. Correll v. Commonwealth, 232 Va. 454, 465, 352 S.E.2d 352, 358 (1987); Robinson v. Commonwealth, 231 Va. 142, 150, 341 S.E.2d 159, 164 (1986). Appellant does not argue that impeachment evidence related to a *defense* witness is exculpatory. He instead contends he was "unfairly ambushed" and, thus, denied a fair trial.

We find the trial court did not abuse its discretion. "[W]hether a trial court should grant a mistrial is a matter resting within its discretion, and absent a showing of abuse of discretion, the court's ruling will not be disturbed on appeal." Cheng v. Commonwealth, 240 Va. 26, 40, 393 S.E.2d 599, 607 (1990). The Commonwealth was under no obligation to disclose its intention to impeach or cross-examine appellant's witness, given the evidence was not exculpatory. The trial court correctly denied appellant's motion.

## CONCLUSION

We affirm appellant's convictions, finding no error in the trial court's rulings.

Affirmed.