COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, O'Brien and White
Argued by videoconference


BRADLEY JAY BROWN

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1223-21-1                      JUDGE KIMBERLEY S. WHITE
                                                    DECEMBER 20, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Leslie L. Lilley, Judge

Kristin Paulding (7 Cities Law, on brief), for appellant.

David A. Mick, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


After a bench trial, the trial court convicted Bradley Jay Brown of aggravated malicious

wounding, common law armed burglary, use of a firearm in the commission of a felony, possession

of ammunition by a convicted felon, larceny of a firearm, maliciously discharging a firearm in an

occupied dwelling, and possession of a firearm by a non-violent felon. By final order entered

November 16, 2021, the trial court sentenced him to a total of thirty-nine years' imprisonment

with twenty-four years suspended. On appeal, Brown challenges the sufficiency of the evidence.

For the following reasons, we affirm in part and reverse and remand in part.

I. BACKGROUND

On August 2, 2018, Brown, his wife Brittany Brown (Brittany), and their young daughter

lived with Brown's friend, Buddy Mees, in Virginia Beach. The Browns previously lived with

Brittany's mother, Mercedes Locke. Locke testified that when Brown lived with her, he sometimes

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

behaved "strange[ly]." Specifically, she suspected that he entered her home by climbing through her upstairs balcony because on several occasions she had left her bedroom door locked and returned to find that items inside the room had been moved even though the door was still locked. On a different occasion, after Locke left her screened kitchen window open, she returned home to find "the screen . . . away from the window" and "mud on [the] countertop." Locke believed that Brown had climbed through the window because only Locke, Brown, and Brittany were living in the house and her backyard was "gated" and "locked with a padlock."

On the night of August 2, 2018, Locke returned home around 10:00 p.m. She testified that it was dark outside, and she suspected that the power might be out because "it was extremely dark" in the house. When she went upstairs and turned to enter the back bedroom, she saw a gun in her face. After she turned away from the gun, she heard a shot. She ran to her bedroom and locked the door. She then heard more gunshots, screamed for someone to call the police, and banged on the wall to alert her neighbor. When the police arrived, the shooter was gone. The police had to break the front door to enter the residence because Locke was still locked in her bedroom. Locke never saw the shooter's face or heard the shooter's voice.

An ambulance took Locke to the hospital. She did not realize until she was in the ambulance that she had been shot in her right arm just above the elbow. She underwent surgery "to repair her arm and fix the humeral fracture." "At the time of the surgery, the radial nerve in her arm was noted to be injured but intact." The surgeon noted that "[t]he gunshot wound resulted in 'significant bone loss.'" The surgeon removed several pieces of bone, inserted a "12-hole metal plate with screws," and utilized a "Vivigen bone graft." Locke stayed in the hospital for several days after the surgery and was in "severe pain."

After the surgery, Locke had a one-to-two-inch scar at the entry wound site, just above her right elbow. At the time of trial in May 2021, she still wore a soft cast on her right arm. She could

not use her right hand for "months" after the shooting. She underwent physical therapy for several months and was able to return to her job at a call center after approximately one month. The nerve damage in her right arm caused "constant numbness" and swelling in her right hand and fingers. Even after she regained some use of her right hand, her hand and fingers tired much more quickly, affecting her ability to play with her grandchildren, walk her dog, and perform tasks like writing and washing dishes.

The parties stipulated that after the shooting, the police found that the window screen on one of the windows in one of the upstairs bedrooms was torn; no evidence was provided as to what the state of the screen was prior to the shooting. "The front facing sliding door was already damaged, but sustained a bullet hole during the incident." The police found multiple bullet holes in the downstairs ceiling and Locke's bedroom door. They recovered "an intact mushroomed slug and shell casing downstairs near the kitchen opening," a shell casing near Locke's bedroom door, a mushroomed slug and a copper casing embedded in the wall of an upstairs bathroom, and a shell casing in one of the upstairs bedrooms. A bullet also struck a vehicle parked in a driveway across the street from Locke's residence.

Between July 2017 and July 2018, Brown worked for a water treatment company owned by Adam Bufton and Bufton's father. During Brown's employment, he and Bufton became friends. In June 2017, Bufton purchased a black .45 caliber SIG Sauer handgun that he kept disassembled in a box behind the seat of his work van. Only Brown and Bufton had access to the work van. Bufton held one set of keys for the van and kept another set in the company office. Brown never had access to the work van by himself but knew where Bufton stored the handgun. While Brown was employed with Bufton's company, he and Bufton went to the shooting range together, and Brown shot Bufton's handgun.

Bufton's father fired Brown in July 2018. After Brown was fired, Bufton noticed that the handgun was missing from the van. Bufton reported the missing firearm to the police and unsuccessfully tried to contact Brown, including by leaving a letter on Brown's vehicle. Bufton never gave Brown permission to take the handgun. Bufton identified a firearm later seized from Mees's residence as the one stolen from his work van.

Mees testified that his residence was three or four blocks from Locke's residence. On the evening of the shooting, Mees and Brown played video games in the downstairs room where Brown and Brittany were staying. At some point, Mees went to bed upstairs. When Mees went to bed, Brittany was cooking in the kitchen; Mees did not "remember exactly what [Brown] was doing at that time." After testifying that he had gone to bed, Mees engaged in the following colloquy with the Commonwealth:

Q:      Okay. And what time was this roughly?

A:      I don't remember exactly. Probably about 9:00, 10:00, somewhere around there.

Q:      At night?

A:      Yeah.

Q:      And that's when you head upstairs?

A:      Yes. I had work the next day.

Sometime after Mees went to bed, Brown and Brittany knocked on Mees's bedroom door to tell him that there were police cars and ambulances at Locke's residence and Brown and Brittany "needed [Mees] to come over." Brown and Brittany told Mees that Brown "had just got back from a jog or walking around." Mees did not know whether Brittany had left the house after he went to bed. Mees drove to Locke's residence in a separate vehicle from Brown and Brittany and was separated from Brown and Brittany at the scene by the emergency vehicles in front of Locke's residence.

- 4 -

Mees remained at the scene in front of Locke's residence for several hours and did not see Brown or Brittany during that time. While there, Mees spoke with detectives. After being convinced by the police on "the severity of what was going on," and being challenged on a previous conflicting statement, Mees admitted that the Browns were living with him.

When Mees returned home, he "looked around where [Brown] and Brittany were staying." Under the coffee table, he found a black "1911" handgun "that was shot so many times that it was locked back" and a box of Elite Performance ammunition. Mees stated that the firearm and ammunition did not belong to him and that he had never seen them before. Mees called the police and told them that he had found the firearm and the ammunition; he placed the firearm on the kitchen counter for the police and left the box of ammunition under the coffee table. He did not move the slide, or cock, load, or unload the firearm. Forensic technician Melinda Dills-Stormer later seized a "SIG Sauer 1911" firearm and magazine and a box containing twelve SIG cartridges from Mees's residence. In a subsequent jailhouse call, Brown told Mees that he "took" the firearm but denied "shoot[ing] anyone."

At the police station, forensic technician Taylor Peters tested Brown's and Brittany's hands for gunshot residue. Department of Forensic Science (DFS) scientist Mary Keehan testified that gunshot residue was detected in both Brown's and Brittany's tests, but more was found in Brown's test. Virginia Beach Police Detective Scott Shields participated in the inventory search of a Ford Expedition SUV that was identified as the "possible suspect vehicle." Inside the SUV, Detective Shields found two SIG .45 caliber cartridges in the "front passenger floor area," an empty "911 [sic] .45 ACP magazine" inside a green bag, and Virginia identification cards with the names "Bradley Jay Brown" and "Brittany Jean Brown." DFS scientist Courtney Etzelmiller testified that three cartridge casings and two bullets recovered from Locke's residence were fired from the handgun seized from Mees's residence.

After the Commonwealth rested its case, Brown moved to strike the evidence of all the charges. During defense counsel's argument in support of the motion to strike the evidence of common law armed burglary, counsel asserted that the Commonwealth was required to prove that Brown entered Locke's residence "in the nighttime," that it is "lighter out later in the day" in August, and that there was no evidence as to "when [the shooter] entered the house." Defense counsel further contended that the Commonwealth could not prove that Brown committed a breaking because the Commonwealth had not proved the point of entry and it was possible that Brown entered the residence through an open door or window.

The trial court granted Brown's motion to strike the evidence on a charge of using a firearm in the commission of armed burglary but convicted Brown on the remaining charges. Brown appeals.

## II. ANALYSIS

### A. Standard of Review

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

"If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)). "Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v. Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)).

## B. Identity of the Shooter

Brown contends that the evidence at trial was insufficient to prove that he was the shooter. He asserts that "there was no evidence that he shot Ms. Locke" because Locke could not identify the shooter, no one saw him at the scene, and no fingerprint or DNA evidence connected him to the scene. We disagree.

As Brown acknowledges, "[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor,* 294 Va. at 512). Brown does not contest the ample circumstantial evidence that he was the shooter. The firearm used in the shooting—which he admitted to taking from Bufton—was found in the room where he was staying. The police found two bullets and an empty magazine in Brown's vehicle.[1] His hands tested positive for gunshot residue, and his whereabouts were unaccounted for at the time of the shooting.

Brown asserts, however, that because some of this circumstantial evidence could also implicate Brittany as the shooter, the Commonwealth could not exclude "every reasonable

---

[1] Brown does not contest that he and Brittany owned the Expedition.

hypothesis except that of guilt." *See id.* Specifically, he contends that the firearm was found in the room where Brittany was staying, ammunition and an empty magazine were found in her car, her hands tested positive for gunshot residue, she lived within walking distance from Locke's residence, and her whereabouts were unaccounted for at the time of the shooting.

We disagree with Brown that the circumstantial evidence gives rise to a reasonable hypothesis of innocence. "When examining an alternate hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *Williams v. Commonwealth*, 71 Va. App. 462, 485 (2020) (quoting *Vasquez*, 291 Va. at 250). "The fact finder 'determines . . . whether to reject as unreasonable the hypotheses of innocence advanced by a defendant.'" *Young v. Commonwealth*, 70 Va. App. 646, 654 (2019) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017)). "Consequently, whether the evidence excludes all reasonable hypotheses of innocence is a 'question of fact,' and like any other factual finding, it is subject to 'revers[al] on appeal only if plainly wrong.'" *Id.* (alteration in original) (quoting *Thorne v. Commonwealth*, 66 Va. App. 248, 254 (2016)).

The evidence at trial established that Brown knew of, had access to, and took Bufton's handgun. Moreover, Mees testified that when Brown and Brittany informed him that there were emergency vehicles at Locke's residence, they also told him that Brown had left Mees's residence to go for a walk or a jog sometime after Mees had gone to bed. Further, even if some of the circumstantial evidence also tended to inculpate Brittany, a rational fact-finder could infer that she was involved in or had some knowledge of the shooting while still finding that Brown was the shooter. Therefore, a rational fact-finder could find that the circumstantial evidence, taken as a whole in the light most favorable to the Commonwealth, renders his hypothesis of

innocence unreasonable. *Williams*, 71 Va. App. at 485. Thus, the Commonwealth's circumstantial evidence was sufficient to prove that Brown was the shooter.

### C. Common Law Armed Burglary

Code § 18.2-89, which codifies the crime of common law burglary, provides that if a person "armed with a deadly weapon" "break and enter the dwelling house of another in the nighttime with intent to commit a felony . . . , he shall be guilty of [armed] burglary." Brown asserts that the Commonwealth failed to prove both the breaking and nighttime elements. We find that the evidence, taken in the light most favorable to the Commonwealth, was sufficient to prove the nighttime element, but insufficient to prove the breaking element.

Breaking, as defined in the burglary statute, "requires the use of physical force." *Pooler v. Commonwealth*, 71 Va. App. 214, 222 (2019) (quoting *Lay v. Commonwealth*, 50 Va. App. 330, 334 (2007)). "Merely pushing open a door, turning the key, lifting the latch, or resort to other slight physical force is sufficient to constitute this element of the crime." *Id.* (quoting *Lay*, 50 Va. App. at 334-35); *see Finney v. Commonwealth*, 277 Va. 83, 89 (2009) ("[T]he Commonwealth [must] *prove* that [the defendant] applied some physical force, however slight, to gain entry to" the victim's dwelling house (emphasis added)).

The parties agree on appeal that the evidence does not show where or how Brown entered Locke's residence. Thus, Brown implies, the evidence does not exclude the reasonable hypothesis that he entered through an open door or window. We agree.

While Locke testified that she kept the gate to her backyard locked with a padlock, she did not testify as to whether her doors and windows were shut when she left her residence on August 2, 2018. There also is no testimony as to the state of repair of the windows, screens, or doors before the shooting. The Commonwealth has based its argument on the assumption that a

rational fact-finder could find that a homeowner who took the precaution of padlocking the gate to her yard kept her doors and windows shut—if not locked—when she left the house.

The fact-finder's decision to reject Brown's reasonable hypothesis of innocence—that he entered through an open door or window without using even the slightest modicum of physical force—was without evidence to support it. Mere inference, without more, is not enough. The Commonwealth provided no evidence that Brown used force to gain entry to the home. The inference that Brown broke into the home is no more reasonable than the inference that he entered through an open window, perhaps the window above the kitchen counter which screen was previously removed or a second story window without a screen or one that was previously torn. *Cf. Davis v. Commonwealth*, 132 Va. 521 (1922). The principle is well established "that where the evidence leaves it indefinite which of several hypotheses is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof [beyond a reasonable doubt], however great the probability may be." *Massie v. Commonwealth*, 140 Va. 557, 565 (1924). "Where an inference supporting guilt is no more likely to arise from a proven fact than one favoring innocence, the inference of guilt is impermissible." *Morton v. Commonwealth*, 13 Va. App. 6, 11 (1991).

The Commonwealth was also required to prove that the breaking and entry occurred "in the nighttime." Code § 18.2-89. In *Wright v. Commonwealth*, 49 Va. App. 312 (2007), we noted that "'night' is generally defined as 'the time from sunset to sunrise.'" *Id.* at 318 (quoting *Black's Law Dictionary* 1071 (8th ed. 2004)). We held "that the General Assembly did not intend for any time other than the hours from sunset to sunrise to be included within the scope of" Code § 18.2-89. *Id.* at 319. Thus, to convict Brown of common law armed burglary, the Commonwealth was required to prove that he entered Locke's house with the intent to commit a felony between the hours of sunset and sunrise. *Id.*; *see Rowland v. Commonwealth*, 281 Va.

- 10 -

396, 399 (2011) ("[A] burglary is complete when the defendant has completed all of the elements of the crime.").

Brown asserts, as he did in the trial court, that the evidence does not show what time he entered Locke's residence. Locke's testimony established that Brown was already inside her house when she returned at 10:00 p.m. but does not prove when he entered. The only other evidence that relates to the time of entry is Mees's testimony that he and Brown played video games downstairs until Mees went to bed upstairs "somewhere around" 9:00 p.m. or 10:00 p.m. Taken together in the light most favorable to the Commonwealth, Locke's and Mees's testimony establish that Brown entered Locke's residence sometime between 9:00 p.m. and 10:00 p.m.

The Commonwealth did not adduce any evidence regarding the time of sunset in Virginia Beach on August 2, 2018. The Supreme Court of Virginia has previously held that "courts may take judicial notice of the time of sunrise and sunset." *Ryan v. Commonwealth*, 219 Va. 439, 445 (1978). Nevertheless, the Supreme Court has held that an appellate court errs in inferring that a trial court had taken judicial notice of a fact when "the trial court did not indicate that it was taking judicial notice of [that] fact" because such an inference would deprive the defendant of the opportunity to object.[2] *Williams v. Commonwealth*, 289 Va. 326, 334-35 (2015); *see Edmonds v. Commonwealth*, 43 Va. App. 197, 201 (2004).

Here, the Commonwealth did not ask the trial court to take judicial notice of the time of sunset on August 2, 2018, and the trial court never stated that it was doing so. Moreover, on appeal the Commonwealth neither asserts that the trial court took judicial notice of the time of

---

[2] "A court may take judicial notice of a factual matter not subject to reasonable dispute in that it is either (1) common knowledge or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Va. R. Evid. 2:201(a). Although "[j]udicial notice may be taken at any stage of the proceeding," "[a] party is entitled upon timely motion to an opportunity to be heard as to the propriety of taking judicial notice." Va. R. Evid. 2:201(b), (c); *see Williams v. Commonwealth*, 289 Va. 326, 334-35 (2015).

sunset nor asks this Court to take judicial notice of that time. Accordingly, nothing in the record establishes when sunset occurred on August 2, 2018.

We conclude that a rational fact-finder could infer that it was nighttime at 10:00 p.m. based on Locke's testimony that it was dark outside at 10:00 p.m. Brown asserts, and we agree, that there is no evidence that can narrow the time of entry within the 9:00 p.m. to 10:00 p.m. period established by Locke's and Mees's testimony. As the Commonwealth notes however, Mees testified that he went to bed "[p]robably about 9:00, 10:00, somewhere around there." The Commonwealth then asked: "At night?", and Mees's responded: "Yeah." The Commonwealth contends that this testimony established that it was already nighttime when Mees went to bed, thereby proving that it was nighttime during the entire one-hour period during which Brown could have entered Locke's residence.

Affording the Commonwealth all reasonable inferences that flow from the testimony, a rational trier of fact could find that it was nighttime at 9:00 p.m. on August 2, 2018. Accordingly, the trier of fact could find that Brown entered Locke's residence in the nighttime regardless of when he entered within the established period of 9:00 p.m. to 10:00 p.m.

Being that the Commonwealth proved the nighttime element of Code § 18.2-89, but failed to prove the breaking element, the Commonwealth failed to prove all elements necessary to convict Brown of common law burglary. However, the Commonwealth sufficiently proved all elements necessary to convict Brown of statutory armed burglary under Code §§ 18.2-90 or 18.2-91 since neither statute requires breaking when the accused makes entrance at night. "[T]he elements of statutory burglary are a subset of the elements of common law burglary and, thus, statutory burglary is a lesser-included offense of common law burglary." *Wright*, 49 Va. App. at 320.

In *Wright*, the Court remanded the case for sentencing due to the evidence showing that the burglary occurred during the day, not at night, in line with the lesser-included offense of statutory burglary under Code § 18.2-91, as opposed to the charged offense of common law burglary under Code § 18.2-89. 49 Va. App. at 321. However, in *Britt v. Commonwealth*, 276 Va. 569, 576 (2008), the Supreme Court ruled that the proper remedy to address a lesser-included offense is to remand the case for a new trial on the lesser charge if neither party has consented to the relief of the lesser charge.

"When an appellant successfully challenges the sufficiency of the evidence on some (but not all) aspects of his conviction, we must determine if the proven elements of the original charge qualify as a lesser-included offense." *Crowder v. Commonwealth*, 41 Va. App. 658, 666 (2003). "If so, the appropriate remedy on appeal is a reversal of the conviction on the greater charge and a remand of the lesser charge for retrial—assuming the Commonwealth, in its prosecutorial discretion, chooses to go forward on the lesser charge." *Id.*; *see also Gorham v. Commonwealth*, 15 Va. App. 673, 678 (1993) (observing that the "consistent practice in Virginia," when the evidence is found insufficient to sustain a conviction on appeal but sufficient to sustain a conviction on a lesser-included offense, is to remand the case for retrial on the lesser-included offense). Therefore, the Commonwealth's evidence is insufficient to convict Code § 18.2-89 but is sufficient to charge for the lesser-included offense of Code §§ 18.2-90 or 18.2-91, depending on the intent alleged.

### D. Aggravated Malicious Wounding

Brown also contends that his conviction for aggravated malicious wounding must be reversed because the Commonwealth failed to prove that Locke suffered a permanent and significant physical impairment. We disagree.

Any person who "maliciously shoots . . . any other person . . . with the intent to maim, disfigure, disable or kill" is guilty of aggravated malicious wounding "if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment." Code § 18.2-51.2. Under Code § 18.2-51.2, a "physical impairment" is "any physical condition, anatomic loss, or cosmetic disfigurement." *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010) (quoting *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995)). "To prove an injury is permanent, the Commonwealth need not present definitive testimony that a victim's injuries will never improve," and the fact-finder may use its "common sense . . . to determine if the injuries are permanent." *Id.* at 644-45; *see Martinez v. Commonwealth*, 42 Va. App. 9, 24-25 (2003). We also have found that a visible scar is a "permanent and significant physical impairment" under Code § 18.2-51.2. *Hawkins v. Commonwealth*, 64 Va. App. 650, 654 (2015) (citing *Newton*, 21 Va. App. at 90).

Locke testified that her bullet wound and the resulting surgery left a one-to-two-inch scar on her right arm just above the elbow. Brown does not contest that this scar itself is sufficient to support the trial court's finding that Locke suffered a permanent and significant physical impairment. *See id.* Moreover, Locke's medical records and her testimony about her physical impairment are sufficient to allow a fact-finder using its common sense to find that her impairment was permanent and significant. The bullet damaged her radial nerve, and the surgeon performed a bone graft and permanently inserted a metal plate in her arm to attempt to repair the bone damage caused by the bullet. Additionally, Locke testified that, nearly three years after the shooting, the nerve damage to her right arm caused "constant numbness" and swelling in her right hand and fingers. Her right hand and fingers also tired much faster than before the shooting, affecting her ability to perform daily tasks and activities. This evidence, viewed in the light most favorable to the Commonwealth, supports the trial court's finding that

- 14 -

Locke suffered a permanent and significant impairment when Brown shot her in the arm. *See Vay*, 67 Va. App. at 242.

### E. Larceny of a Firearm

Finally, Brown contends that the Commonwealth did not prove that he intended to permanently deprive Bufton of his firearm. We again disagree.

Under Virginia law, to prove larceny, the Commonwealth must prove that the defendant took the property of another with the "intent to deprive the owner of his property *permanently*." *McEachern v. Commonwealth*, 52 Va. App. 679, 684 (2008) (quoting *Overstreet v. Commonwealth*, 17 Va. App. 234, 236 (1993)). Thus, "[t]here is no larceny where the defendant, by actual or constructive trespass, takes the property of another with the intent to use it temporarily and thereafter to return it to the owner." *Id.* at 685 (alteration in original) (quoting 3 Charles E. Torcia, *Wharton's Criminal Law* § 351, at 396 (15th ed. 1995)). At the same time, "the very existence of a trespassory taking permits the inference (unless other circumstances negate it) that the taker intended to steal the property." *Id.* "In determining intent, 'the factfinder may consider the conduct of the person involved and all the circumstances revealed by the evidence.'" *Id.* at 684 (quoting *Welch v. Commonwealth*, 15 Va. App. 518, 524 (1992)).

Brown does not contest that he took Bufton's firearm. Under the applicable standard of review, that taking permits a rational fact-finder to find that Brown intended to permanently deprive Bufton of the firearm unless the evidence sufficiently negates that inference. *Id.* at 685; *Vasquez*, 291 Va. at 248. There is no such evidence in this case. Brown asserts that if he took the firearm before his termination, when he and Bufton were friends, a rational fact-finder could find that he lacked the intent to permanently deprive Bufton of the gun.

However, a rational fact-finder could find that Brown took the firearm after he was fired based on Bufton's testimony that he did not notice that the firearm was missing until after Brown

was fired.  Even if the fact-finder concluded that Brown took the firearm before his termination, the fact that the taking was not necessarily motivated by animus arising out of the termination does not preclude a finding that he intended to steal the firearm.  Brown points to no other evidence to negate the inference that he took the firearm with the intent to permanently deprive. *See McEachern*, 52 Va. App. at 685.  Thus, the evidence is sufficient to prove larceny.

CONCLUSION

For the foregoing reasons, we affirm Brown's convictions of aggravated malicious wounding, use of a firearm in the commission of a felony, possession of ammunition by a convicted felon, larceny of a firearm, maliciously discharging a firearm in an occupied dwelling, and possession of a firearm by a non-violent felon.  We reverse Brown's conviction of common law armed burglary and remand for a new trial on statutory armed burglary, if the Commonwealth so chooses.

*Affirmed in part, reversed in part, and remanded.*