COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Chief Judge Decker, Judges AtLee and Frucci
Argued by videoconference


JOHN DONTREL HARRIS
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1184-24-1                      JUDGE STEVEN C. FRUCCI
                                                    FEBRUARY 10, 2026
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
                     Robert H. Sandwich, Jr., Judge

           Lauren E. Brice, Assistant Public Defender (Virginia Indigent
           Defense Commission, on briefs), for appellant.

           Jason D. Reed, Senior Assistant Attorney General (Jason S.
           Miyares,[1] Attorney General, on brief), for appellee.


        Following a jury trial, the Circuit Court of the City of Suffolk convicted John Harris of

first-degree murder and statutory burglary while armed.[2]  The circuit court sentenced Harris to

life imprisonment plus 10 years of incarceration with no time suspended.[3]  On appeal, Harris

argues that the circuit court erred in denying his motion to strike the statutory burglary charge

because there was insufficient evidence that he entered the dwelling house of another.  He further

contends that the circuit court erred in denying his motion to strike the first-degree murder

───────────────

        * This opinion is not designated for publication.  See Code § 17.1-413(A).

        [1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

        [2] The circuit court also convicted Harris of malicious wounding, wounding during the
commission of a felony, and use of a firearm in the commission of murder.  This appeal is
limited to the convictions of first-degree murder and statutory burglary while armed.

        [3] The circuit court sentenced Harris to 18 years of incarceration, with no time suspended,
on the remaining convictions.

charge because there was insufficient evidence that it was done during the commission of a burglary and that the killing was willful, deliberate, and premeditated. Harris also challenges the circuit court's finding that his evidence of a theory for an alternative killer was irrelevant, had no bearing on this case, and would confuse the jury. For the following reasons, we affirm the circuit court's judgment.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

On August 28, 2022, D.H.[4] and Marianna Ricks returned to D.H.'s home between 3:00 a.m. and 4:00 a.m. after a night out with friends. D.H. unlocked the front doors, and they walked into the living room. Ricks walked toward the bathroom and saw Jamel Brown, Harris's cousin, sitting in the dark in one of the bedrooms. Ricks yelled, jumped back, and before she could alert D.H. that someone was in the house, Harris suddenly passed her, asking D.H.: "Where you been? Who the fuck you been with?" As Harris approached, D.H. was standing in the living room behind the couch near the front door. D.H. responded that she had only been with Ricks. Then Harris started shooting from approximately two and a half feet away. Ricks said that Harris shot "more than two" times.

After the shooting stopped, Harris grabbed Ricks by her coat sleeve, pulled her into the kitchen, grabbed a knife from the sink, and "started swinging it" at Ricks. Ricks did not

---

[4] We use initials, rather than names, to protect the privacy of the victim.

immediately realize that he had stabbed her. When the knife broke, Harris grabbed another knife and started swinging again. Ricks fought back and knocked his glasses off. Harris retrieved his glasses, "jumped across [D.H.] and left out." Before fleeing, he turned, pointed the gun at Ricks and said that if she told anyone, he would do the same thing to her. Ricks did not see Brown leave.

D.H.'s phone rang; it was Preston Davis.[5] Ricks answered D.H.'s phone and told Davis that "there's something wrong with Lyn.[6] Like, she's been shot." At that time, Ricks thought that D.H. was still alive. Davis and a friend came to the house, stood by the doorway near the couch, called D.H.'s name, and told Ricks to call 911. Ricks called D.H.'s mother and then called the police.

Suffolk Police Officers Lamont Greer, Austin Cain, and Shamar James responded to the 911 call at 4:39 a.m. Entering the house through the two front doors, the officers saw "a female laying motionless on the floor" lying in a "lot of blood," later identified as D.H., and Ricks who was in the kitchen on the telephone. Officer Greer confirmed that D.H. was deceased and saw that she had been shot multiple times, at least once in the head. Officers Cain and James found "blood droplets" on the floor around parts of a broken butcher knife.[7] Ricks gave D.H.'s cellphone to Officer Cain and Brown's wallet to Officer Greer.

Officer James found two shell casings behind the couch a few feet away from D.H.'s body and blood in a bedroom to the left of the living room. Forensic Technician Mary DeLugo photographed Ricks's injuries then documented the scene and found seven cartridge cases and

---

[5] Davis had recently started a relationship with D.H.

[6] D.H.'s nickname was Lyn.

[7] Officers Greer and Cain had body camera video which was played for the jury.

bullet fragments. The casings, cartridges, and a swab of the knife handle were submitted to the Department of Forensic Science (DFS) for analysis.[8]

Ricks identified Harris, a former boyfriend of D.H.'s, as the shooter. Officer David Adams went to Tiffany Parker's house, where Harris was believed to be.[9] Harris was not there, but Officer Adams collected a firearm in a dresser in one of the bedrooms. Harris was arrested on August 30, 2022, and indicted for statutory burglary while armed; first-degree and second-degree murder; aggravated malicious wounding and wounding during the commission of a felony; use of a firearm in the commission of a felony; and possession of a firearm by a violent felon.[10]

At the preliminary hearing, Brown said that he had dropped Harris off at D.H.'s house before 4:00 a.m. on August 28, 2022, then left. He stated that he returned before 4:30 a.m. because Harris's "mother had told [him] to go get him." Brown said Harris was still inside because "he lived there" and let Brown in. He said he and Harris were in the back bedroom "[d]rinking, chilling. Just chilling." Brown said they were both "coming down off a drunk high" and that he fell asleep. He woke up when Ricks came into the room and spoke to him. Brown denied hearing gunshots but said, "I think I heard -- it was like somebody else came there. I don't know who the other dude was or whatever." When he finally heard multiple gunshots, he "jumped up . . . eased [his] way up," went into the living room and "just found Lyn dead right there by the front door." Brown said he "just ran . . . just left . . . panicked . . . ran." He said he did not see who shot D.H.

Brown said that Harris and D.H. "always lived together," had "their ups and downs, but they always lived together." He denied that the couple were broken up the day of the murder, that they

---

[8] The police obtained buccal and hand swabs and primer residue kits from Harris and submitted them at the same time.

[9] Parker and Harris had a child-in-common and a sporadic relationship.

[10] The circuit court granted Harris's motion to sever the charge of being a felon in possession of a firearm from the jury trial.

"don't never break up," and described their "ups and downs" as arguments but he never saw them be "physically abusive."

Before trial, the parties stipulated to the fact that the deceased was D.H. and to the admission of her autopsy report. They agreed that the chain of custody for evidence submitted to DFS was not altered or tampered with at any time. Finally, the parties agreed that the medical records for Ricks's injuries and the Verizon records for Harris's phones were true and accurate and that no custodian of records was required to authenticate them.

Also before trial, the circuit court granted the Commonwealth's "oral motion in limine" to exclude evidence. Harris sought to include evidence that Davis was charged with (and ultimately convicted of) homicide unrelated to this case a week after D.H.'s death. The circuit court found that it had no bearing on this case and that it would actually confuse the jury.

At trial, the officers confirmed that there were no open windows in the house and no obvious damage to the doors or windows and that only the screen door for the locked back door was open. Only Ricks and D.H. were in the house when the officers arrived and cleared it for safety.

April Ruffin, one of D.H.'s best friends, was "like a sister" and was part of the group D.H. had gone out with that night. She said that D.H. and Davis were "about to be dating," but said Harris was D.H.'s "ex-boyfriend" and had "broken up," "were completely done" at least two weeks before the murder. Ruffin described the D.H.-Harris relationship as "on[-]and[-]off" for "like[] two years," perhaps "closer to three years," a "make-up break-up situation at first." She said the relationship was "very one-sided," that Harris was "the controller," and that it was "hostile." Ruffin said Harris was "very jealous" over D.H. She said D.H. and Harris had lived together "at the beginning" so that "everyone knew."

Ruffin said that Harris precipitated the recent break-up by posting "embarrassing pictures" of "[D.H.'s] house" to "paint[] a story as if her house was dirty" on Facebook. D.H. had responded,

- 5 -

"I'm not going to talk to him. I do not want any ties. It was too much." Ruffin explained that D.H. had changed the locks to her house so Harris would know that "[they were] over with." And that D.H. kept a spare key on the refrigerator so "she always knew where it was" and she would "typically lock her doors" when she left home. Ruffin said that Harris did not enter the home after the locks were changed.

Ruffin saw D.H. "every day, basically" and went to D.H.'s home "almost every day." D.H. and her minor daughter were the only people who lived in the house. Ruffin added that it had been "at least a month" since Harris "completely was not supposed to be there at all, whatsoever."[11]

Ricks described D.H. as her "best friend" and was with her and the group the night she was killed. She identified Harris as D.H.'s "ex-boyfriend" and that the break-up was "recent," "not even a full 24 hours" old. Ricks said that the D.H.-Harris relationship was "good" at first. Ricks moved out of state but rekindled her friendship with D.H. "about a month prior to August 28[]." They were together "probably every other day," so she had the opportunity to observe D.H.'s relationship with Harris. Ricks characterized it as a "bad relationship," they were "hardly [talking]," and they were "broken up" on the night of the killing. She acknowledged that she had seen Harris at D.H.'s house in early June 2022 and saw items that appeared to belong to Harris.

Ricks said that she and D.H. returned to the house "around 3:00 or 4:00-something in the morning" and Harris came out of the darkened back room walking towards D.H. She described Harris as being "kind of tight," "a calm aggressive." Ricks did not see the gun–described as a black handgun, not a revolver–before Harris approached and asked D.H., "Where you been? Who the fuck you been with?" and then began shooting "about a minute" later. Ricks thought he was shooting blanks because she "didn't see any, like, shells flying or anything," but only saw "flashes."

---

[11] During the investigation, Ruffin told Detective Koziana that she assumed that Harris had taken the spare key off the refrigerator, but no evidence was presented that he had done so.

Once he left, Ricks saw that D.H. was "wedged in between the couch," "no more than two feet" from her room. In response to the prosecution's question, "[w]ho killed Lyn?" Ricks said, "John."

Forensic technician Mary DeLugo qualified as an expert in digital forensics and described the results of her analysis of D.H.'s cellphone. In the days before the shooting, D.H. and Harris exchanged many text messages.[12] For example, D.H. texted saying, "If we done, we done"; "I don't care about no being with you"; "[a]in't not coming back or explaining no shit like that"; "enjoy your [love] life"; "leave me alone man"; and "[b]lock me like you did yesterday, you got what you want now leave me alone." Harris's texts included, "[b]itch fuck yo hoe ass that's why I left to"; "[b]ye"; and "wish u well . . . you never keep a man for long."

DeLugo said the records showed that Harris started texting D.H. at 2:47 a.m. the morning of the shooting and continued until 4:15 a.m. One of her final texts to Harris read, "[y]ou don't need to know shit about me. I'm not [sic] longer your concern," followed by a winking emoji blowing a kiss. The last text message from Harris to D.H. was sent at 4:23 a.m. the morning of the shooting. It read, "U [l]iein but ok man."

FBI Special Agent William Lopez, a member of the cellular analysis survey team (CAST), analyzed the call detail records from Harris's two phones.[13] His analysis depicted the locations "where the cell phone signal is coming from" and included Parker's house, Tonya Harris's[14] house, Parker's mother's house, and the crime scene (D.H.'s house). Harris's two phones traveled together

---

[12] The record includes 20 pages of text messages exchanged between D.H. and Harris beginning 2 days before the shooting, which were read into the record. Only those pertinent to the issues on appeal are included here.

[13] Ruffin said that Harris had two cell phones: one he used to communicate with D.H.; he used the other, a "trap phone," to "do secret things on." The CAST analysis designated the main phone as the "blue phone" and the other as the "red phone." Both were registered to Harris as the owner.

[14] Tonya Harris is Harris's mother. Detective Koziana stated that Tonya and her husband arrived at D.H.'s house "pretty quick[ly]" after the shooting.

from east to west, pinging the same cell tower. From 2:23 a.m. to 2:24 a.m. just before the shooting, the phones pinged off the tower closest to the crime scene. The phones were stationary near or at the crime scene between 2:23 a.m. and 2:46 a. m. Harris's phone made an outgoing call to D.H. at 2:32 a.m. which lasted two minutes and four seconds. The phones began moving again between 2:46 a.m. and 2:53 a.m., away from the crime scene area and toward Harris's mother's house. The blue phone started moving at 3:01 a.m. and was back at the crime scene at 3:18 a.m.

The red and blue phone signals separated at 3:18 a.m. and did not reunite. Harris received a call from his mother on the blue phone at 3:30 a.m. that lasted 5 minutes and 20 seconds. At 4:31 a.m., the blue phone moved from the crime scene toward Parker's residence, arriving at 4:44 a.m. At 4:44 a.m., the blue phone called Tonya Harris; the call lasts 33 seconds. Four minutes later, it received a call from Tonya Harris which lasted about 30 seconds.

Wendy Gunther, M.D., the assistant medical examiner, qualified as an expert in forensic pathology. Dr. Gunther stated that D.H. had "three gunshot wounds to her head, one of them fatal, and two that just went in and out of her scalp without going through her skull." There were "two gunshot wounds to [D.H.'s] torso, one of which was fatal." There was also a non-fatal gunshot wound to her knee. Dr. Gunther told the jury that one of the shots to D.H.'s head was "hard contact," meaning that "the gun is pressed into the scalp at the moment that the trigger is pulled." The entrance wound showed "stippling," defined as "what happens when you fire a gun within less than a couple of feet of a person," averaging "around two feet."

Dr. Gunther described one gunshot wound to D.H.'s torso as "close range" with stippling and it was about a "half-inch from the middle of the spine." Another torso wound had a steep downward trajectory through the chest and perforated D.H.'s ribs, lung, diaphragm, liver, and then exited through her back behind the kidney. It also had "a tiny amount of stippling," meaning that the gun was either "real close or more likely there was [sic] other objects in the way." According to

the autopsy report, D.H. had no alcohol or drugs in her system when she died. D.H.'s cause of death was "multiple gunshot wounds."

Helen Lake, a forensic scientist with DFS, qualified as an expert witness specializing in firearm examination and identification. She said that she received seven 9mm caliber Luger cartridge cases from the investigation. All were fired from the same firearm, but the ballistics did not match the firearm collected at Parker's house.

At the conclusion of the Commonwealth's evidence, Harris moved to strike the charges for insufficient evidence. As to the statutory burglary charge, he argued that although D.H. and Harris had broken up, they were still in contact, and that the "logical inference" for the missing spare key on the refrigerator was that Harris may have taken it and, therefore, had permission to enter D.H.'s house. Harris argued that there was insufficient evidence that Harris had an unlawful intent when he entered the residence, saying that he would not have otherwise brought an accomplice. He contended that the murder was not premeditated, willful, or deliberate because he was "upset" and "began firing." Finally, he argued that Ricks, a victim and the only eyewitness, had a "strange . . . recollection of events" and there was "obviously . . . more to the story." The circuit court denied the motion, finding that "[a]ll of the issues and all of the concerns that have been brought up by the defense are jury [issues]." The defense declined to put on evidence, and Harris's motion to strike was renewed and denied.

The circuit court instructed the jury. After closing arguments, they deliberated and returned verdicts of guilty on all charges.[15] At sentencing, the circuit court imposed a sentence of life plus 28 years of incarceration, none suspended. This appeal, limited to the convictions on statutory burglary while armed and first-degree murder, follows.

---

[15] The jury found Harris guilty of malicious wounding, a lesser included offense to the charge of aggravated malicious wounding.

ANALYSIS

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The question on appeal is not if the Court believes the evidence at trial was sufficient, but rather if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cappe v. Commonwealth*, 79 Va. App. 387, 398 (2024) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

I. *There was sufficient evidence to deny Harris's motion to strike the burglary charge.*

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). "When the sufficiency of [the Commonwealth's] evidence is challenged by a motion to strike, the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in the [Commonwealth's] favor." *Avent v. Commonwealth*, 279 Va. 175, 198 (2010) (alterations in original) (quoting *Banks v. Mario Indus.*, 274 Va. 438, 454 (2007)). "In

- 10 -

the context of a jury trial, a trial court does 'not err in denying [a] motion to strike the evidence [when] the Commonwealth present[s] a *prima facie* case for consideration by the fact finder.'" *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (alterations in original) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)). Whether the evidence is sufficient to prove each element of a crime "is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Id.* (quoting *Linnon*, 287 Va. at 98).

Burglary is "primarily an offense against the security of [another's] habitation." *Pooler v. Commonwealth*, 71 Va. App. 214, 220 (2019) (alteration in original) (quoting *Turner v. Commonwealth*, 33 Va. App. 88, 92 (2000)). Statutory burglary is defined as "any person in the nighttime [who] enters without breaking . . . and conceals himself in a dwelling house . . . with intent to commit murder." Code § 18.2-90. If "armed with a deadly weapon at the time of entry," it is a Class 2 felony. *Id.* Statutory burglary is a "specific intent" crime and the prosecution must prove that the "defendant committed an unlawful entry with the requisite intent." *Velasquez v. Commonwealth*, 276 Va. 326, 329 (2008). "Intent can be inferred from the facts and circumstances of a case and shown by the acts of the defendant." *Jones v. Commonwealth*, 279 Va. 295, 299 (2010).

A dwelling house is defined as "a house that one uses for habitation, as opposed to another purpose." *Grimes v. Commonwealth*, 288 Va. 314, 317 (2014) (quoting *Giles v. Commonwealth*, 277 Va. 369, 375 (2009)). A person cannot "unlawfully break and enter a home in which [he] . . . has the right to occupy." *Pooler*, 71 Va. App. at 221 (quoting *Justus v. Commonwealth*, 274 Va. 143, 155 (2007)). But even "a person authorized to enter a dwelling" may be guilty of burglary if he exceeds the scope of his permission to do so, including by entering to commit a criminal act. *Jones*, 279 Va. at 300. "[P]ermission or authorization to enter may be negated by [his improper] intent" when entering. *Id.*

Harris argues that "[p]erhaps the primary consideration is whether the victim had ever rescinded or revoked the accused's ability to come and go from the property at issue." The record supports that D.H. had revoked her permission for Harris to enter her house. Through her text messages to Harris and statements to her friends, D.H. made it clear that she and Harris were no longer in a relationship. After the Facebook postings, she said that she was not going to talk to him and wanted no ties to him. She changed the locks on the doors to her home she shared with her minor daughter. Ricks and Ruffin, described as D.H.'s best friends, saw D.H. at her home nearly every day, and had not seen any belongings of Harris in the house since early June, two months before the murder. Although Ruffin assumed that Harris had taken the spare key off the refrigerator, there was no evidence that he did so with D.H.'s permission or even knowledge. Indeed, this Court has held that mere possession of a key to a home did not grant "blanket permission to be there." *Pooler*, 71 Va. App. at 224.

D.H. told her friends that she was "completely done" with Harris approximately two weeks before the murder. Just days before her murder, D.H. texted Harris that she did not care about not being together and explicitly told him to leave her alone. Even Harris, through his text statements, knew that they were not together. Two days before the killing, Harris texted that he had broken up with D.H. We find that the circuit court had sufficient evidence to deny Harris's motion to strike on the issue that Harris unlawfully entered the dwelling place of another after D.H. had revoked or rescinded permission for Harris to be in her home.

The record supports Harris's conviction of statutory burglary while armed. Harris had Brown drop him off at D.H.'s home between 3:00 and 4:00 a.m. She was not home. He unlawfully entered at nighttime presumably without breaking in–there were no unlocked doors or windows. Harris concealed himself in a dark bedroom lying in wait for D.H.'s return. His phone was making calls and sending texts to his mother and D.H. from the house between 2:23 and 2:46 a.m., then

- 12 -

again starting at 3:18 a.m. He had a loaded firearm. He exited the bedroom and moved toward D.H., asking D.H. where she had been and with whom. When she answered, he began firing from no more than two-and-a-half-feet away.

After maliciously wounding and threatening Ricks, Harris fled. It is "today universally conceded that the fact of an accused's flight, . . . and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *Walker v. Commonwealth*, 79 Va. App. 737, 749 (2024) (alteration in original) (quoting *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991)). "Evidence of flight is 'a circumstance proper to be laid before the jury as having a tendency to prove [a defendant's] guilt.'" *Langhorne*, 13 Va. App. at 102 (alteration in original) (quoting *Allen v. United States*, 164 U.S. 492, 499 (1896)). "[I]n order to show a 'consciousness of guilt,' a nexus must exist between the flight and the alleged offense." *Ricks v. Commonwealth*, 39 Va. App. 330, 335 (2002) (citing *Jarrell v. Commonwealth*, 132 Va. 551, 569 (1922)). The CAST data showed his phone moving from D.H.'s house at 4:31 a.m. to Parker's home, where he spoke with his mother at 4:44 and 4:48 a.m.

Accordingly, the circuit court properly denied Harris's motion to strike the prosecution's evidence for insufficiency.

II. *There was sufficient evidence to deny Harris's motion to strike the murder charge.*

Having found that the circuit court had sufficient evidence to submit the statutory burglary while armed charge to the jury, we now consider Harris's challenge to the sufficiency of the evidence to support a conviction of first-degree murder during the commission of a burglary.

On appellate review of the sufficiency of the evidence, "the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "[T]he relevant question is whether, after viewing the evidence in the light

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).

In Virginia, first-degree murder includes "any willful, deliberate, and premeditated killing." Code § 18.2-32. "To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second-degree murder." *Cappe*, 79 Va. App. at 399 (quoting *Betancourt v. Commonwealth*, 26 Va. App. 363, 372 (1998)). The Commonwealth must prove that there was a killing, that there was a "reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill"; and the "performance of that act with malicious intent." *Id.* (quoting *Betancourt*, 26 Va. App. at 372-73). Seldom proved by direct evidence, "premeditation and formation of an intent to kill" may be sufficiently proved by a "combination of circumstantial factors." *Id.* (quoting *Betancourt*, 26 Va. App at 373).

"Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case. The state of mind of an alleged offender may be shown by his acts and conduct." *Burton v. Commonwealth*, 281 Va. 622, 626-27 (2011) (quoting *Ridley v. Commonwealth*, 219 Va. 834, 836 (1979)). "When an unlawful entry is made into a dwelling of another, the presumption is that the entry was made for an unlawful purpose,

- 14 -

and the specific intent with which such entry was made may be inferred from the surrounding facts and circumstances." *Sandoval v. Commonwealth*, 20 Va. App. 133, 138 (1995).

To show a willful, deliberate, and premeditated killing, the "intent[ion to kill] . . . 'need not exist for any specified length of time prior to the actual killing.'" *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). Rather, "the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill.'" *Id.* (quoting *Remington*, 262 Va. at 352). In fact, under Virginia law, "an intent to kill may be formed at the moment of the commission of the unlawful act." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

Premeditation means to adopt a specific intent to kill that needs to exist only for a moment to sustain the conviction. Code § 18.2-32. "[It] is a factual question, reserved for determination by the [jury]." *Martinez v. Commonwealth*, 42 Va. App. 9, 22 (2003). "[E]vidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994) (quoting *Hodge v. Commonwealth*, 217 Va. 338, 343 (1976)). "Premeditation is a factual question, reserved for determination by the [jury]." *Martinez*, 42 Va. App. at 22. The jury "may properly consider the brutality of the attack . . . and the defendant's lack of remorse and efforts to avoid detection." *Avent*, 279 Va. at 208 (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)). One circumstance commonly associated with first-degree murder is shooting the victim "at close, and thus predictably fatal, range." *Jackson*, 443 U.S. at 325. Another is firing a weapon more than once. *Chandler v. Commonwealth*, 249 Va. 270, 280 (1995).

"Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great

- 15 -

provocation." *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016) (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)). The act "must be done 'willfully or purposefully.'" *Diaz v. Commonwealth*, 80 Va. App. 286, 314 (2024) (quoting *Woods*, 66 Va. App at 131. Malice may be inferred from "'the deliberate use of a deadly weapon unless, from all the evidence,' there is reasonable doubt as to whether malice existed." *Washington v. Commonwealth*, 75 Va. App. 606, 621 (2022) (quoting *Avent*, 279 Va. at 201-02). "A deadly weapon is one which is likely to produce death or great bodily injury from the manner in which it is used, and whether a weapon is to be regarded as deadly often depends more on the manner in which it has been used than on its intrinsic character." *Hampton v. Commonwealth*, 34 Va. App. 412, 419 (2001) (quoting *Pannill v. Commonwealth*, 185 Va. 244, 254 (1946)).

Harris's actions were deliberate, willful, and premeditated. Harris's statements through text messages indicated that he was jealous of D.H. possibly dating someone else and posted degrading comments about her and her home when they were in a relationship. D.H.'s best friends described Harris as being very jealous and controlling. He arranged for a ride to D.H.'s house so she would not see a parked car on her return. He unlawfully entered her home at night with a loaded firearm. It is a reasonable conclusion that he only had a key to the house after D.H. changed the locks because he removed it without her knowledge or permission some time before the murder. Harris stalked her virtually in the early morning hours of August 28 through multiple text messages and telephone calls. Brown described their activities earlier in the house as "[d]rinking, chilling." Harris continued to text and call D.H. after he concealed himself in her house and accused her of lying minutes before she returned home. Ricks described Harris's demeanor as "a calm aggressive" when he entered the living room shouting questions at D.H. He shot D.H. seven times at close range; the two fatal gunshot wounds suggested that the muzzle was in "hard-contact" with D.H.'s skin and stippling around the entrance wounds was consistent

with close range shooting.  Accordingly, the circuit court had sufficient evidence to allow the charge of first-degree murder during a burglary to go to the jury.

III.  *The circuit court reasonably refused evidence of a 3rd party's subsequent conviction.*

"When reviewing a trial court's decision to admit or exclude evidence, we apply an abuse of discretion standard."  *Bista v. Commonwealth*, 303 Va. 354, 370 (2024).  "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not."  *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)).  "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance."  *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor*, 285 Va. at 212).  "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred."  *Bista*, 303 Va. at 370 (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).

Harris argues that the circuit court erred in excluding evidence of Davis's conviction for murder, a charge that was pending at the time of D.H.'s murder.  Davis called, spoke with Ricks, and came to her house minutes after Harris murdered her.  He encouraged Ricks to call 911, then left before the police arrived.  Harris sought to introduce evidence that, a week after D.H.'s murder, Davis was charged with and convicted of a separate homicide.[16]  The Commonwealth argued that the evidence was not relevant, was highly prejudicial, and there was no evidence that Davis was responsible for D.H.'s murder.  Harris argued that he was entitled to "present an

---

[16] It is unclear from the record if that chronology was accurate, or if Harris meant that Davis was simply charged and subsequently convicted.  The prosecution presented the facts as being charged a week later.

alternative theory" of the murder to the jury. He contended that the evidence was relevant because Davis was at the "scene on or about the time that [D.H.] was killed and that a week later he was convicted of murder." The circuit court disagreed with Harris, finding that "th[e] fact that [Davis] was charged with a murder and, ultimately, convicted of a murder a week later" had nothing or "any bearing on this case, whatsoever." It also found that such evidence would "actually . . . confuse the jury."

Proffered evidence "that merely suggests a third party may have committed the crime charged is inadmissible; only when the proffered evidence tends clearly to point to some other person as the guilty party will such proof be admitted." *Juniper v. Commonwealth*, 271 Va. 362, 412 (2006) (quoting *Elliott v. Commonwealth*, 267 Va. 396, 424 (2004), *cert. denied*, 543 U.S. 1081 (2005)). "Even if evidence is otherwise admissible, it may be excluded if the danger for unfair prejudice or the likelihood of confusion for the jury substantially outweighs the evidence's probative value." *Lambert v. Commonwealth*, 70 Va. App. 740, 755 (2019); *see also* Va. R. Evid. 2:403.

There was no evidence presented that linked Davis to D.H.'s murder. Ricks witnessed Harris approaching and shooting D.H. seven times at close range in D.H.'s house that morning. Davis called D.H., Ricks answered and told him that D.H. had been shot, and he arrived minutes later. Thus, the circuit court appropriately exercised its discretion by keeping irrelevant and unsubstantiated evidence out of the jury's purview.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*